# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**WESTERN SURETY COMPANY**

**CIVIL ACTION**

**VERSUS**

**NO. 17-1643-JWD-RLB**

**PASI OF LA, INC., ET AL.**

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

This matter is before the Court on *Western Surety Company's Motion for Preliminary Injunction*.[1]  Defendants PASI of La., Inc.; Professional Application Services, Inc.; PASI Properties, LLC; Mark W. Alexander; Howard K. Lobell; and Sammie G. Lobell oppose the motion.  Both sides have submitted evidence and filed proposed findings of fact and conclusions of law[2] and reply briefs.[3]  On September 21, 2018, the Court held an evidentiary hearing.[4]  The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule.

---

[1] *Western Surety Company's Motion for Preliminary Injunction*, Doc. 11.

[2] *Western Surety's Company's Findings of Fact and Conclusions of Law in Support of Motion for Preliminary Injunction* ("*Western's PFFCL*"), Doc. 40; *Defendants' Proposed Findings of Fact & Conclusions of Law in Opposition to Plaintiff's Motion for Preliminary Injunction* ("*PASI's PFFCL*"), Doc. 41; *PASI's PFFCL*, Doc. 51;  *Western Surety Company's Updated Findings of Fact and Conclusions of Law in Support of Motion for Preliminary Injunction*, Doc. 52.  The second set of proposed findings of fact and conclusions of law from each party are the same in substance as their originals; the later ones were simply updated to include citations to exhibits that would be used at the preliminary injunction hearing. *See Notice to Counsel*, Doc. 49.

[3] *Western Surety Company's Response to Defendants' Proposed Findings of Fact and Conclusions of Law* ("*Western's Resp.*"), Doc. 46; *Defendants' Response to Plaintiff's Proposed Findings of Fact & Conclusions of Law* ("*PASI's Resp.*"), Doc. 47.

[4] *See Joint Exhibit List*, Doc. 53.

Pursuant to Federal Rule of Civil Procedure 52(a), the Court enters these Findings of Fact and Conclusions of Law. If any finding is in truth a conclusion of law, or if any conclusion stated is in truth a finding of fact, it shall be deemed so.

## I.    FINDINGS OF FACT

### A.  The Parties, the Construction Project, and the Performance Bond

1. Defendant PASI of LA, Inc. ("PASI") is a contractor specializing in industrial blasting and painting/coating.[5]

2. Plaintiff Western Surety Company ("Western" or "Western Surety") is a bonding company that issues surety bonds on construction projects, and is a wholly owned subsidiary of CNA Financial Corp.[6]

3. On June 24, 2014, PASI, as subcontractor, entered into an agreement ("Subcontract") with general contractor, Harry Pepper & Associates, Inc. ("HPA" or "Harry Pepper").[7]

4. The Subcontract called for PASI to perform blasting and painting services as part of HPA's "principal" contract with NASA, the owner, for the restoration of the B-2 Test Stand at the John C. Stennis Space Center in Hancock County, Mississippi ("Project").  HPA required PASI to provide a subcontract performance bond.[8]

---

[5] *See* Affidavit of Mark W. Alexander ("Alexander Aff.") ¶ 2, Doc. 41-1.  The Court may consider affidavits and deposition testimony in deciding this motion for preliminary injunction. *See Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993) ("[a]t the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence. Thus, the district court can accept evidence in the form of deposition transcripts and affidavits."  (citing *Fed. Sav. and Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558-59 (5th Cir. 1987)).

[6] Rule 30(b)(6) Deposition of Western Surety ("Western Dep.") 85: 1–4, Ex. 60.

[7] HPA-PASI Subcontract 1, Ex. 2.

[8] Alexander Aff. ¶ 4, Doc. 41-1; HPA-PASI Subcontract 1, Ex. 2.

5.  In order to induce Western to issue surety bonds, PASI, Professional Applications Services, Inc. ("Professional"), PASI Properties, LLC ("PASI Properties"), Mark W. Alexander ("Alexander"), Howard K. Lobell ("Mr. Lobell"), and Samie G. Lobell ("Ms. Lobell") (PASI, Professional, PASI Properties, Alexander, Mr. Lobell, and Ms. Lobell are sometimes hereinafter collectively referred to as the "Indemnitors"), as indemnitors, each executed a General Agreement of Indemnity (the "Indemnity Agreement"), dated April 1, 2011, in favor of Western.[9] Western also collected a premium payment from PASI.[10]

### B. The General Agreement of Indemnity

6.  The Indemnity Agreement jointly and severally obligates the Indemnitors to:

> [I]ndemnify and save the Surety harmless from and against any Loss which the Surety may pay or incur. In the event of any payments made by the Surety in the good faith belief of their necessity, the Indemnitors agree to accept the voucher or other evidence of such payments as *prima facie* evidence of the propriety thereof, and of the Indemnitors liability therefore to the Surety;[11]

7.  A "Loss" is defined in the Indemnity Agreement as:

> (a) any and every claim, demand, liability, cost, charge, suit, judgment, fee, interest on any amounts due the Surety, and expense, including but not limited to attorney fees and consultant fees incurred by the Surety as the result of issuing or considering the issuance of a Bond; (b) any cost incurred by the Surety in the process of procuring, or attempting to procure, release from liability under a Bond; (c) the cost to the Surety of making any independent investigation of a claim, demand or suit arising under a Bond; (d) any cost incurred by the Surety in bringing suit to enforce the obligation of any of the Indemnitors under this Agreement; and (e) any other cost

---

[9] Affidavit of Laurence P. Jortner ("Jortner Aff.") ¶ 3, Doc. 40-1; General Agreement of Indemnity ("Indemnity Agreement") 1, Ex. 1.

[10] Indemnity Agreement § 2, Ex. 1.

[11] Indemnity Agreement § 3(a), Ex. 1.

incurred by the Surety in good faith as a result of having issued or procured the issuance of a Bond.[12]

8. The Indemnity Agreement provides that the Indemnitors shall:

> [D]eposit with the Surety on demand collateral security in an amount and kind satisfactory to the Surety in its sole discretion whenever the Surety shall reasonably determine that such collateral is necessary to protect it from Loss whether or not the Surety has made any payment. The Surety shall have the right to use the deposit, or any part thereof, in payment or settlement of any Loss for which the Indemnitors would be obligated to indemnify the Surety under the terms of this Agreement if for any reason the Surety shall deem it necessary to increase the amount necessary to protect it from Loss, the Indemnitors shall deposit with the Surety, immediately upon demand, a sum of money equal to any increase thereof as collateral security to the Surety for such Loss. Any unused collateral security shall be returned to the depositing Indemnitors when the Surety determines, in its sole discretion, that the collateral security is no longer necessary to protect it from Loss. The Surety has no duty to invest or pay interest on the deposit.[13]

9. The Indemnity Agreement defines an Event of Default as:

> [T]he occurrence of any one or more of the following: (a) any breach of any of the terms and conditions of this Agreement; . . .[14]

10. In the Indemnity Agreement, the Indemnitors agreed that upon the occurrence of an Event of Default:

> [T]he Indemnitors hereby assign, transfer, and set over to the Surety all of their rights under the Bonded Contracts, including: i. their right, title and interest in and to all subcontracts let in connection therewith; ii. all machinery, plant, equipment, tolls and materials upon the site of the work or elsewhere for the purposes of the Bonded Contracts, including all material ordered for the Bonded Contracts; iii. all patents, licenses, permits and computer software used for the performance of any Bonded Contract and/or financial record keeping of the same; iv. all actions, causes of action, claims

---

[12] Indemnity Agreement § 1, Ex. 1.

[13] Indemnity Agreement § 3(b), Ex. 1.

[14] Indemnity Agreement § 1, Ex. 1.

and demands whatsoever relating to the Bonded Contracts; and v. any and all sums due under the Bonded Contracts at the time of the Event of Default or which may thereafter become due;[15]

11. The Indemnity Agreement provides that:

> The Surety shall have the exclusive right and power to determine for itself and the Indemnitors and Principals whether any claim, suit, or assertion of liability against the Surety or the Principal upon any Bond shall be settled, compromised, tendered, or defended. The Surety's decision in such regard shall be binding and conclusive upon the Indemnitors.[16]

### C. Issuance of the Bond

12. PASI applied to Western to issue a payment bond and a performance bond for the Subcontract.[17]

13. In full reliance on the terms and conditions of the Indemnity Agreement executed by Indemnitors, Western, as surety, issued a Subcontract Performance Bond (the "Performance Bond") and a Subcontract Payment Bond (the "Payment Bond") (the Performance Bond and the Payment Bond are sometimes hereinafter referred to jointly as the "Bonds") with PASI as principal/subcontractor/obligor and Harry Pepper as obligee/contractor for the Subcontract.[18]

14. The Bonds each had a penal sum of Four Million Eight Hundred Seventy-Four Thousand Four Hundred Thirty-Five and No/100 ($4,874,435.00) Dollars.[19]

15. Further, the Performance Bond provided:

---

[15] Indemnity Agreement § 9(b), Ex. 1.

[16] Indemnity Agreement § 5, Ex. 1.

[17] Jortner Aff. ¶ 4, Doc. 40-1.

[18] Jortner Aff. ¶ 5, Doc. 40-1; Bonds, Ex. 3.

[19] Jortner Aff. ¶ 5, Doc. 40-1; Bonds, Ex. 3.

4. **PRINCIPAL DEFAULT.** Whenever the Principal shall be, and is declared by the Obligee to be in default under the Subcontract, with the Obligee having performed its obligations in the Subcontract, the Surety may promptly remedy the default, or shall promptly:

> 4.1 **COMPLETE SUBCONTRACT.** Complete the Subcontract in accordance with its terms and conditions; or

> 4.2 **OBTAIN NEW CONTRACTORS**. Obtain a bid or bids formally, informally or negotiated for completing the Subcontract in accordance with its terms and conditions, and upon determination by the Surety of the lowest responsible bidder, or negotiated proposal, or, if the Obligee elects, upon determination by the Obligee and the Surety jointly of the lowest responsible bidder, or negotiated proposal, arrange for a contract between such party and the Obligee. The Surety will make available as work progresses sufficient funds to pay the cost of completion less the balance of the contract price. The cost of completion includes responsibilities of the Principal for correction of defective work and completion of the Subcontract; the Obligee's legal and design professional costs resulting directly from the Principal's default, and; liquidated damages or actual damages if no liquidated damages are specified in the Subcontract. The term "balance of the contract price," as used in this paragraph, shall mean the total amount payable by the Obligee to the Principal under the Subcontract and any amendments to it, less the amount properly paid by the Obligee to the principal; or

> 4.3 **PAY OBLIGEE**. Determine the amount for which it is liable to the Obligee and pay the Obligee that amount as soon as practicable; or

> 4.4 **DENY LIABILITY**. Deny its liability in whole or in part and notify and explain to the Obligee the reasons why the Surety believes it does not have responsibility for this liability.[20]

**D. HPA Terminates PASI from the Project**

16. Sometime in January of 2015, a dispute arose on the Project regarding allegations of airborne lead contamination.[21]

---

[20] Performance Bond Art. 4, Ex. 3.

[21] Alexander Aff. ¶ 7, Doc. 41-1; Letter from NASA to HPA, January 27, 2015, Ex. 4.

17. On or about January 28, 2015, Harry Pepper notified PASI that it was in default of the Subcontract.[22] Harry Pepper specifically stated that PASI lacked a current Mississippi certification for a Lead Based Paint abatement firm, which, HPA claimed, was "in breach of the subcontract agreement and non-compliant with local, state and federal law."[23] PASI was given three days "to cure its default", which "include[d] but [was] not limited to providing a response to all of the items in NASA's letter that will enable work to resume and PASI to strictly comply with the terms of the Subcontract and Prime contract."[24]

18. According to Mark W. Alexander, PASI's Vice President, HPA took the position that PASI was responsible for the alleged contamination.[25]

19. PASI vigorously disputed responsibility for any contamination condition and questioned whether any such condition existed at all.[26]

20. By letter of February 25, 2015, from Harry Pepper to PASI, Harry Pepper terminated the Subcontract and informed PASI that Harry Pepper "intend[ed] to hold Western and PASI responsible for all costs associated with completion of the work as well as any and all damages HPA might sustain because of PASI's failure to properly perform its work."[27]

21. PASI, at all times relevant from the initial claim by HPA until the present, has adamantly denied that PASI defaulted on the subcontract for the Project and has consistently advised

---

[22] Jortner Aff. ¶ 6, Doc. 40-1; Letter from HPA to PASI, January 28, 2015, Ex. 5.

[23] Letter from HPA to PASI, January 28, 2015, Ex. 5.

[24] Letter from HPA to PASI, January 28, 2015, Ex. 5.

[25] Alexander Aff. ¶ 8, Doc. 41-1.

[26] Alexander Aff. ¶ 8, Doc. 41-1.

[27] Jortner Aff. ¶ 7, Doc. 40-1; Letter from HPA to PASI, February 25, 2015, Ex. 9.

Western that PASI was not liable to HPA for a default on the subcontract for the Project.[28]

### E.  The Dispute Between HPA, PASI, and Western Surety

22. By letter dated February 25, 2015 from Harry Pepper to Western, a copy of which was sent to PASI, Harry Pepper notified Western that PASI's subcontract was terminated and made demand on Western to perform its obligations under the Performance Bond.[29]

23. After initially receiving HPA's notification, Western assigned the claim to Theodore Gryfinski, senior claims consultant.[30] Mr. Gryfinski admitted at his deposition that his initial impression was that PASI had been wrongfully terminated.[31] "It's kind of back and forth, but, generally speaking, [Gryfinski] felt all along that they were wrongfully terminated."[32]

24. On or about March 13, 2015, Western conducted a site visit of the Project.[33]

25. On April 7, 2015, HPA receives bids from ADS Services, Inc. ("ADS") in the amount of about $2.9M to complete sandblasting and lead paint abatement and M Natal Contractor, Inc. ("M. Natal") in the amount of about $736K to complete painting scope.[34]

---

[28] *See, e.g.,* Email Chain (particularly Western_000499), July 2015, Ex. 19; Email from Mark Alexander (of PASI) to Theodore Gryfinski (of Western), October 1, 2015, Ex. 26; Letter from PASI to Western, October 13, 2015, Ex. 27; Letter from PASI to Western, November 18, 2015, Ex. 34; Email Chain between James Carver and Jim Green (Western's attorney), August 15–16, 2017, Ex. 50.

[29] Jortner Aff. ¶ 8, Doc. 40-1; Letter from HPA to Western, February 25, 2015, Ex. 10.

[30] *See* Western Dep. 16:3–17:24, Ex. 60.

[31] Western Dep. 29:11–31:10, Ex. 60.

[32] Western Dep. 31:7–10, Ex. 60.

[33] Email Chain between HPA and Western, March 11, 2015, Ex. 11.

[34] ADS and M. Natal Bids, April 7, 2015, Ex. 12.

26. On April 8, 2015, HPA wrote a letter to Western.[35]  HPA stated that PASI was terminated

    for default as "a result of PASI's actions on 19 January 2015 when PASI allowed a

    breach in a containment area to occur and their failure to follow their Site Specific Lead

    Paint Removal Compliance Plan."[36]  The letter expressed that "Since the date of the

    breach basically all productive painting and blasting [has] stopped."[37]  The letter stated

    that "PASI's actions have caused approximately a 3 month delay to the project and the

    costs associated with the delay are increasing on a day by day basis until painting and

    abrasive blasting operations recommence.  Therefore, [HPA] must take action to stop the

    delay and move the project forward toward completion."[38]   The April 8, 2015 letter also

    provided completion bids from two replacement subcontractors, ADS and M. Natal, and

    requested Western's authorization for HPA to engage those subcontractors to complete

    the scope of work.[39] Alternatively, HPA requested that Western propose an alternate

    method for completion.[40] HPA requested Western's response by April 14, 2015.[41]

27. On April 28, 2015, HPA wrote another letter to Western.[42]  There, HPA stated that since

    HPA's February 25, 2015, demand on Western, Western "ha[d] not provided [HPA] with

---

[35] Letter from HPA to Western, April 8, 2015, Ex. 13.

[36] Letter from HPA to Western, April 8, 2015, Ex. 13.

[37] Letter from HPA to Western, April 8, 2015, Ex. 13.

[38] Letter from HPA to Western, April 8, 2015, Ex. 13.

[39] Letter from HPA to Western, April 8, 2015, Ex. 13.

[40] Letter from HPA to Western, April 8, 2015, Ex. 13.

[41] Letter from HPA to Western, April 8, 2015, Ex. 13.

[42] Letter from HPA to Western, April 28, 2015, Western Dep. Ex. 10, Ex. 60.

a proposed method of completing PASI's remaining work."[43]   HPA noted that, three weeks prior, HPA had proposed using ADS and M Natal and that, "At that time HPA requested authorization from WSC to issue the subcontracts.  Not having heard anything on 16 April 2015 HPA again requested WSC's authorization.  As of this date [Western] has failed to provide any type of response."[44]   HPA asserted that, to meet its obligations to NASA, HPA could "no longer wait on a response from" Western and that HPA "must take immediate action to resume the work that ha[d] been delayed as a result of PASI's failure to properly perform."[45]   HPA informed Western that it would tender subcontracts to ADS and M Natal; that the "cost of these two subcontracts will exceed the remaining amounts of PASI's contract balance by approximately $250,000"; and that HPA intended to hold Western and PASI "responsible" for "any and all" costs "associated with PASI's default".[46]

28. On April 29, 2015, Western responded by letter to HPA.[47] Western stated that it disagreed with HPA's assessment because "one of the surety's fundamental rights is the right to investigate the declaration of default by the obligee and the underlying contract at issue."[48]   Western further stated: "While we have been willing to cooperate and consider HPA's proposals [with ADS and M Natal], as surety we are entitled to accept or reject

---

[43] Letter from HPA to Western, April 28, 2015, Western Dep. Ex. 10, Ex. 60.

[44] Letter from HPA to Western, April 28, 2015, Western Dep. Ex. 10, Ex. 60.

[45] Letter from HPA to Western, April 28, 2015, Western Dep. Ex. 10, Ex. 60.

[46] Letter from HPA to Western, April 28, 2015, Western Dep. Ex. 10, Ex. 60.

[47] Letter from Western to HPA, April 29, 2015, Western Dep. Ex. 11, Ex. 60.

[48] Letter from Western to HPA, April 29, 2015, Western Dep. Ex. 11, Ex. 60.

suggested contracts or otherwise put to bid with other contractors for competitive pricing."[49] Western denied that it had "done nothing"; denied having copies of the ADS and M Natal proposals; said that it "appear[ed] that HPA has elected to move forward under its own volition without the surety's agreement as to process objective"; indicated that Western "expect[ed] HPA to mitigate any and all damage during the prosecution of the work; and "strictly reserve[d]" its rights under the Bond, contract, and law.[50]

29. According to the deposition of Willie Dobes, President and CEO of Harry Pepper, if Western had timely denied HPA's claim against on the performance bond regarding the project, the cost overrun over the subcontract price to complete the work of PASI on the project would have only been approximately $250,000.[51] Dobes further stated that, as a direct result of Western's untimely denial of HPA's claim against WSC on the performance pond, HPA anticipated that the actual cost overrun over the contract price to complete the work of PASI on the project was going to be approximately $2,500,000.[52]

30. On May 7, 2015, Western emailed HPA that the ADS price was too high and that ADS' inability to obtain a bond was a deal breaker.[53]

---

[49] Letter from Western to HPA, April 29, 2015, Western Dep. Ex. 11, Ex. 60.

[50] Letter from Western to HPA, April 29, 2015, Western Dep. Ex. 11, Ex. 60.

[51] Deposition of Willie Dobes (of HPA) ("HPA Dep.") 7:23–8:6, Ex. 59.

[52] HPA Dep. 8:7–16, Ex. 59.

[53] Email from Ted Gryfinski to Chip McCutcheon (of HPA), May 7, 2015, Ex. 14.

31. On May 8, 2015, Keith Roberts, of Roberts, Taylor, Sensabaugh ("RTS") emailed HPA informing HPA that RTS has been retained to assist in the re-let process and to schedule inspection of the site.[54]

32. On or about June 26, 2015, Industrial Corrosion Control, Inc. ("ICCI"), submitted a bid with a price range of between about $5.3M and $9.3M.[55]

33. On July 20, 2015, Western's attorney sent an email to HPA's counsel stating that it would "like to make a run at settling at least the actual work performance aspect of this."[56]  Western's attorney stated, "PASI is objecting to the ADS and M NATAL completion estimates as being too high for a number of reasons so the surety is being cautious in its attempt to settle in order to preserve its subrogation rights.  That is the reason we're looking for some reduction in those estimates."[57]

34. On July 20, 2015, Western sent a proposed partial release agreement to HPA in which Western proposed paying HPA the difference between the remaining subcontract funds and the ADS and M Natal estimates - approximately $227,000.[58]

35. On July 23, 2015, Western received revised quotes from M Natal and ADS.[59] M Natal provided a lump sum quote of $1,146,520 for painting, which is a roughly $410,000

---

[54] Email from Keith Roberts (of RTS) to Chip McCutcheon, May 8, 2015, Ex. 15.

[55] Email Chain between HPA and PASI (particularly Western_002504) June 2015 to March 2016, Ex. 16.

[56] Email from Jim Green to Jim Staak (HPA's attorney) July 20, 2015, Ex. 17.

[57] Email from Jim Green to Jim Staak, July 20, 2015, Ex. 17.

[58] Email Chain between Jim Green and James Carver, April 29, 2016, Ex. 36.

[59] *See* Email Chain between Jim Green and James Carver, July 24, 2015, Ex. 18.

increase from the quote given in April.[60] ADS's revised lump sum for blasting and abatement had a lump sum total of $3,637,685, which includes roughly $3M for the contract completion and about $615K for "Back Charge" work items.[61] As Jim Green stated in a contemporaneous email, "These increase the proposed completion costs by ADS and M Natal by $1,082,476."[62]

36. On July 24, 2015, HPA sent Western a letter.[63] HPA stated, after HPA declared PASI in default on January 28, 2015, "Western was notified of the default in letters of February 13, 18, and 19, 2015."[64] "Since [PASI's] termination [on February 25, 2015,] HPA has repeatedly demanded that Western meet its Bond obligations. Western has failed and refused to do so."[65] Western purportedly requested "voluminous records" from HPA, which were provided "in March", yet, despite that, "Western's failure to promptly proceed under [the Bond] continued."[66] HPA then details how, in April 2015, it submitted proposed bids, but "Western refused to accept the pricing from these contractors" because they provided no bond, even though that was not a requirement in

---

[60] Email Chain between Jim Green and James Carver (particularly Western_001694–97), July 24, 2015, Ex. 18.

[61] Email Chain between Jim Green and James Carver (particularly Western_001702), July 24, 2015, Ex. 18.

[62] Email Chain between Jim Green and James Carver (particularly Western_001694), July 24, 2015, Ex. 18.

[63] Letter from HPA to Western, July 24, 2015, Ex. 20.

[64] Letter from HPA to Western, July 24, 2015, Ex. 20.

[65] Letter from HPA to Western, July 24, 2015, Ex. 20.

[66] Letter from HPA to Western, July 24, 2015, Ex. 20.

the Western-HPA Bond.[67]  On April 29, Western stated that it "intended to put the completion work out to bid", but "[n]early four months passed" and "Western . . . never formally issued HPA the results of that bidding process," other than to verbally state that one bid was too high.  HPA stated: "The delay associated with this rebidding has not only further impacted the Project but also has caused Pepper and Western to lose the opportunity to contract with the two contractors at the pricing they had offered in April."[68]  Those contractors provided higher prices to HPA's recent inquiries.[69]  PASI closed by saying that Western was in default, that six months had passed since the default, that Western had ten days to make an election under the bond, and, if Western did not, HPA would "proceed to complete the work in the fastest and most economical means possible without Western's involvement."[70]

37. On or about July 24 and 25, 2015, PASI informed Western that ADS bid was incredibly inflated and called for work not within PASI's scope of work.[71]

38. Additionally, sometime around late July of 2015, Laurence Jortner, claims director of Western, first became aware of HPA's claim on the bond.[72]  Prior to that, Mr. Gryfinski was the direct representative on the claim.[73]  Jortner said that he became involved

---

[67] Letter from HPA to Western, July 24, 2015, Ex. 20.

[68] Letter from HPA to Western, July 24, 2015, Ex. 20.

[69] Letter from HPA to Western, July 24, 2015, Ex. 20.

[70] Letter from HPA to Western, July 24, 2015, Ex. 20.

[71] Email Chain between Jim Green and James Carver (particularly Western_000501), July 2015, Ex. 19.

[72] Western Dep. 86:11–87:5, Ex. 60.

[73] Western Dep. 87:6–11, Ex. 60.

because his direct supervisor, Walter Kubalanza, said there had been complaints to his supervisor, John Welsh, about how the claim was handled and that, since Jortner was Gryfinkski's supervisor, Jortner should look at the issue.[74]  The complaints were made to CNA and were passed down to Jortner.  These complaints emanated from both EMCOR and Harry Pepper.[75]

39. According to Jortner, the complaint from EMCOR came from an in-house attorney specializing in conflicts resolution.[76]  "EMCOR was contacting CNA because there was a liability insurance relationship with CNA.  So Harry Pepper as a subsidiary of EMCOR was going to the parent company to try and use that as leverage to get action that they might find desirable on their claim. And what they got is a meeting."[77] But Jortner continued:

> There was no relationship that I was aware of from the surety department or the surety division or Western at any time between the surety until [PASI] made your inquiries in 2018 in discovery of this litigation when we searched the records with a fine-toothed comb and found that a totally unrelated EMCOR subsidiary to this case, a Hyre Electric out of Indiana, was issued a couple of small bonds, a permit bond or a maintenance bond of some type with very, very small premiums, I think, like, $250 or something. . . . But I was unaware of any relationship having to do with Surety and EMCOR or any of its subsidiaries except for Harry Pepper until 2018.[78]

---

[74] Western Dep. 87:15–88:5, Ex. 60.

[75] Western Dep. 88:16–21, Ex. 60.

[76] Western Dep. 92:16–19, Ex. 60.

[77] Western Dep. 92:22–93:4, Ex. 60.

[78] Western Dep. 93:14–94:7, Ex. 60.

40. On August 10, 2015, Western's attorney sent a letter to HPA in response to a July 31, 2015, letter about completing the project and resolving the claims.[79] Western advised HPA that neither ADS or M Natal can provide bonds, and their scope of the work was "not in the original scope of the PASI subcontract."[80] Other issues with the bids were discussed as well.[81]

41. On August 10, 2015, RTS issued to Western a Preliminary Report.[82] In RTS's Preliminary Report, RTS stated that "HPA is attempting to hold PASI accountable for contaminating the entire B Test stand, that includes the occupied interior and exterior spent abrasive and paint chips which were distributed throughout the stand."[83] RTS went on to provide "some examples of other subcontractor's potential and reported culpability in stand contamination."[84] As to its conclusion, RTS stated in relevant part:

> The facts, the allegations surrounding this project, and the reluctance by HPA to provide additional information caused us to question the actions of NASA and HPA and the subsequent termination of PASI. Attempts by the Surety and RTS have been undertaken to locate a bondable replacement subcontractor or subcontractors that would serve to mitigate any potential loss in the completion of the work of this subcontract. The complicated nature of this project and the questionable reputation of HPA appears to have caused potential completion contractors from providing completion bids. . . .
>
> We have been in support of negotiating with HPA for the resolution of the performance portion of this project by their utilizing their existing contractors (ADS & Natal), but counsel for HPA has placed unreasonable

---

[79] Letter from Western to HPA, August 10, 2015, Ex. 21.

[80] Letter from Western to HPA, August 10, 2015, Ex. 21.

[81] Letter from Western to HPA, August 10, 2015, Ex. 21.

[82] RTS Preliminary Report 1, August 10, 2015, Ex. 22.

[83] RTS Preliminary Report 8, August 10, 2015, Ex. 22.

[84] RTS Preliminary Report 8–9, August 10, 2015, Ex. 22.

demands in the proposed agreement with the Surety. ADS and Natal have just recently provided revised and increased pricing for the completion work. The qualifications added by Natal and differing from their prior bid appear to reflect current or ongoing HPA problems in the scheduling and construction of the facility that PASI has reported.[85]

As to recommendations, RTS stated in relevant part:

> We do not believe that the Surety can reach an agreement with HPA for completion and it appears that no other alternative exists but to allow HPA to contract directly with its subcontractors for the completion of the work. HPA must mitigate its loss and their completion of this subcontract work should be monitored if allowed to do so.

> The Surety should obtain, through counsel for PASI, copies of the FOIA request documents to determine the validity of PASI's claims and potentially consider support PASI in its move to litigate for wrongful termination. Seldom, in our experience, is a wrongful termination defense an easy task to support and it is often an uphill battle considering the onerous terms and conditions found in many contracts and subcontracts. The future facts to be learned may find PASI at fault, but it seems logical to continue to support the research underway in light of HPA's counsel refusing to agree to completion with all parties reserving their rights.[86]

42. On or about August 27, 2015, Harry Pepper initiated an arbitration demand with the American Arbitration Association against PASI for damages, and PASI asserted a counter-claim against Harry Pepper for funds alleged to be due under the Subcontract.[87]

43. On October 1, 2015, in accordance with and pursuant to Paragraph 3 of the Indemnity Agreement, Western made demand on the Indemnitors for the deposit of $2,500,000.00 in collateral.[88]  This collateral is the subject of the instant motion.  Gryfinski signed the

---

[85] RTS Preliminary Report 9–10, August 10, 2015, Ex. 22.

[86] RTS Preliminary Report 10, August 10, 2015, Ex. 22.

[87] Jortner Aff. ¶ 16, Doc. 40-1; HPA Demand for Arbitration, August 27, 2015, Ex. 23.

[88] Jortner Aff. ¶ 13, Doc. 40-1; Collateral Demand Letter from Western to Indemnitors (and attachments), October 1, 2015, Ex. 25.

letter, though he stated that the analysis was done by his supervisor, Larry Jortner.[89]

Jortner was asked to provide all the information he considered in making the determination for the $2.5M in collateral, and he responded:

> The collateral demand, this was a tough claim because, first of all, a collateral demand is based on an estimate, and we elected not to put a reserve on this particular one because we knew that the damages were likely to be very high. We looked at this as the obligee, Harry Pepper, was going to go after us for the full bond penalty, the penal sum of the bond, and their demand was up there.
>
> And it hinged on whether the termination of default was valid or not because of that, which, we didn't have enough information to determine. We felt that it was a reasonable defense raised by PASI, and certainly there was a defense, and it was something that PASI felt very strongly about.
>
> But we just didn't have enough information, so I didn't want to make a demand for the whole bond penalty, which, I think the surety would have been within its rights to do. So I, essentially, went for a little more than half, because I knew that the damages, there was this $500,000 in contract balance and knew this thing was going to be demanded well over 3 million. And I knew the surety was going to incur a lot in attorneys' fees and costs.
>
> So all that went in my thinking to say, okay, where might be the point where CNA  might have to settle this once we got all the information together if it doesn't go PASI's way. So that's really the best explanation I can do.
>
> I talked to Roberts, Taylor & Sensabaugh, I talked to -- you know, we had the correspondence with Mr. Staak, went through that and, basically, looked at everything that Ted [Gryfinski] did and talked to him about what was done and what was not done about this and came to that decision for the 2.5.[90]

---

[89] Western Dep. 75:8–16.

[90] Western Dep. 95:1–96:17, Ex. 60.

44. Western also submitted with the letter a document entitled "Costs to Complete PASI's Scope of Work."[91]  The total was about $2.67M.  Jortner testified that this amount represented a potential loss to Western under the Bond.

45. On October 1, 2015, Mark Alexander of PASI responded to the collateral demand stating it will not provide collateral.[92] PASI stated: "First of all let me assure you that this Company nor its subsidiaries have anything close to that total.  We personally do not have anything close to that amount of money either."[93]  PASI then said that it was under the "assumption" from when Western "first sat down in [PASI's] office and told everyone present that [Western was] going to inform HPA that [Western was] going to deny [HPA's] claim."[94]  PASI claims that Western then told PASI's attorney that it Western was going to deny the claim.  PASI then states: "**We again deny all HPA's claims and charges!  We do not agree to the charges in you[r] letter today.**"[95] PASI claimed: "What you are attempting to do is put us out of business so we cannot continue to pursue our claim for **wrongful termination** against HPA including damages. . . . It is hard enough fighting HPA for wrongful termination and then have to fight the insurance carrier that we paid a fee to to [sic] protect our interest to turn on us without justification. That is down right wrong and in my opinion criminal."[96]

---

[91] Collateral Demand Letter from Western to Indemnitors (and attachments), October 1, 2015, Ex. 25; HPA's Costs to Complete PASI's Scope of Work, September 17, 2017, Ex. 24.

[92] Email from Mark Alexander to Theodore Gryfinski, October 1, 2015, Ex. 26.

[93] Email from Mark Alexander to Theodore Gryfinski, October 1, 2015, Ex. 26.

[94] Email from Mark Alexander to Theodore Gryfinski, October 1, 2015, Ex. 26.

[95] Email from Mark Alexander to Theodore Gryfinski, October 1, 2015, Ex. 26 (emphasis in original).

[96] Email from Mark Alexander to Theodore Gryfinski, October 1, 2015, Ex. 26 (emphasis in original).

46. On or about October 7 and 8, 2015, Jim Carver and Larry Jortner exchanged emails.[97]

Carver states: "Just a reminder note; PASI does not have the money to pay the demand by Friday. If Western were to force the issue it would drive PASI and the other companies and the individuals into bankruptcy."[98] Carver also reiterated that PASI was not at fault, urged that Western deny the claim, and noted that he received information about a possible conflict of interest with Western, CNA, EMCOR, and Harry Pepper.[99] Jortner responded by saying, among other things, that (1) Western still needed to investigate the claim; (2) by not reimbursing Western and providing collateral, an Event of Default had occurred; (3) while Western is willing for its consultant to meet PASI's "technical people . .. without lawyers present for either side, per [PASI's] request," Western will not provide "free discovery" by giving PASI "consultant reports and investigative material" because PASI must provide information to Western under the Indemnity Agreement, "not the other way around."[100] Western declared: "Western see[s] this as a complex, bona fide legal and factual dispute between PASI and Harry Pepper and is not prepared to and does not see it as at all prudent for[] the surety to dismiss the termination for default action of Harry Pepper out-of-hand, as you and your client seem to be prevailing upon it to do."[101]

---

[97] Email Chain from Jim Carver to Laurence Jortner, October 7–8, 2015, Ex. 28.

[98] Email Chain from Jim Carver to Laurence Jortner, October 7–8, 2015, Ex. 28.

[99] Email Chain from Jim Carver to Laurence Jortner, October 7–8, 2015, Ex. 28.

[100] Email Chain from Jim Carver to Laurence Jortner, October 7–8, 2015, Ex. 28.

[101] Email Chain from Jim Carver to Laurence Jortner, October 7–8, 2015, Ex. 28.

47. On October 13, 2015, Jim Carver responded to Laurence Jortner by letter.[102]  Carver

    stated it was "disturbing" that, since Jortner became involved, "Western [wa]s taking

    such a hostile position toward its principal in this matter, even though the facts do not

    support that PASI was in default."[103]  Carver reiterated that HPA's estimate was "grossly

    inflated" and that it is free from fault.[104]  Carver also questioned Jortner's "free

    discovery" line, stating that "While we do not wish to be adverse to Western, it appears

    that you are moving in that direction."[105]Carver also stated: "It does appear that Western

    failed to timely investigate this matter."[106]  The letter otherwise reflects a deteriorating

    relationship between Western and PASI,[107] and, at the hearing, Carver testified that this

    was caused by Jortner's involvement in the matter.

48. On October 16, 2015, ICCI submitted a Time and Material proposal to complete work.[108]

49. On October 16, 2015, HPA proposed an agreement to settle with Western for about

    $3.4M.[109]

---

[102] Letter from Jim Carver to Western, October 13, 2015, Ex. 27.

[103] Letter from Jim Carver to Western, October 13, 2015, Ex. 27.

[104] Letter from Jim Carver to Western, October 13, 2015, Ex. 27.

[105]  Letter from Jim Carver to Western, October 13, 2015, Ex. 27.

[106] Letter from Jim Carver to Western, October 13, 2015, Ex. 27.

[107] Letter from Jim Carver to Western, October 13, 2015, Ex. 27.

[108] Email Chain between Theodore Gryfinksi and Chip McCutcheon, October 16, 2015 to March 29, 2016, Ex. 29.

[109] Email Chain between Mark Pritchard (of HPA) and Laurence Jortner, October 13–16, 2015, Ex. 30.

50. On October 29, 2015, Western sent a letter to HPA denying the performance bond claim.[110] In the letter, Western claimed that its obligations under Article 4 of the Performance Bond had "not been demonstrated to have been triggered to Western's satisfaction to date" because of HPA's "overreaction" to NASA's complaints.[111] Western further asserted that it "believe[d] that PASI ha[d], at bare minimum, a reasonable basis for asserting that HPA wrongfully terminated them for default."[112] Further, if PASI prevailed on the wrongful termination issue, Western would have no obligation to HPA as surety under Article 4.[113] Western also maintained that HPA failed to mitigate its damages.[114] Western further had "deep concerns over whether HPA's course of conduct aggravated the situation created by NASA's actions and improperly poisoned the project's atmosphere, thereby making competitive, reasonable bids impossible for the surety."[115] Western "join[ed] PASI in fully disputing this performance bond claim."[116] All of that said, as PASI notes, this letter came eighty days from the issuance of the RTS Preliminary Report and two hundred, forty-six days after HPA's initial February 25, 2015, demand.

---

[110] Letter from Western to HPA, October 29, 2015, Ex. 32.

[111] Letter from Western to HPA, October 29, 2015, Ex. 32.

[112] Letter from Western to HPA, October 29, 2015, Ex. 32.

[113] Letter from Western to HPA, October 29, 2015, Ex. 32.

[114] Letter from Western to HPA, October 29, 2015, Ex. 32.

[115] Letter from Western to HPA, October 29, 2015, Ex. 32.

[116] Letter from Western to HPA, October 29, 2015, Ex. 32.

51. However, on October 29, 2015, Western also proposed an $860,000 loan payment (with certain conditions) to HPA as a settlement.[117]

52. On November 17, 2015, HPA sent Western a letter.[118] In the letter, HPA complained extensively about Western's failure to act promptly, asserting:

> The termination occurred more than ten months ago and it was not until October 29th that CNA made any election under Section 4 of the Bond. As such, CNA has exacerbated rather than mitigated the problems caused by PASI's defaults and termination. As such, CNA defaulted on its performance bond obligation and remains in default.[119]

HPA also referenced its July 24, 2015, letter which expressed urgency in the situation, yet CNA "ignored [the] letter and continued to drag its feet in assisting HPA in the performance of the work."[120] HPA also objected to CNA's refusal to accept HPA's replacement bids and with CNA's statements throughout the process that HPA did not furnish adequate information.[121]

53. On November 18, 2015, PASI's attorney sent Western a letter.[122] PASI described in great detail the various ways in which it was wrongfully terminated from its contract with HPA.[123] Jim Carver, the letter's author, said at the hearing that he did so in an effort to cooperate with Western. PASI concluded the letter by stating:

---

[117] Email Chain between Laurence Jortner and Mark Pritchard, October 29, 2015, Ex. 31.

[118] Letter from HPA to Western, November 17, 2015, Ex. 33.

[119] Letter from HPA to Western, November 17, 2015, Ex. 33.

[120] Letter from HPA to Western, November 17, 2015, Ex. 33.

[121] Letter from HPA to Western, November 17, 2015, Ex. 33.

[122] Letter from PASI to Western, November 18, 2015, Ex. 34.

[123] Letter from PASI to Western, November 18, 2015, Ex. 34.

We trust that this more detailed information will assist you in responding to HPA's letter.  We cannot comment on HPA's allegations that Western's decision was not prompt, and thus caused damage.

Further, while PASI wishes to be fully cooperative with Western on this matter, PASI is concerned that in spite of denying HPA's claim on the bond, that Western has refused to provide PASI with any new bond requests. Without bonding, PASI cannot work.  Without work, PASI will not have income and the implications of that are clear.

Thus we ask that Western reconsider its decision not to honor bonding for Professional Application.[124]

54. The exhibits reflect a gap in major activity between PASI's November 2015 letter and the March 2016 mediation.[125]

55. On March 24, 2016, a mediation between PASI, Crum & Foster (PASI's insurance provider), Western, and HPA occurred.[126]

56. At that mediation, Western offered $900,000, and HPA countered with between about $2.8M and $4.9M.[127]

57. On April 29, 2016, Western and PASI's attorneys had several exchanges.[128]  Western's counsel informed PASI's that, in July 2015, he sent HPA a proposed settlement: "what the surety was proposing was to pay HPA the difference between the remaining subcontract funds and the sum of the ADS and M NATAL initial estimates.  That amount

---

[124] Letter from PASI to Western, November 18, 2015, Ex. 34.

[125] *See Federal Rule of Evidence Article 1006 Summary to Prove Content*, Doc. 46-1 at 2; *Joint Exhibit List*, Doc. 53 at 2–3.

[126] Email Chain involving multiple parties, December 30, 2015 to January 7, 2016, Ex. 35.

[127] Email Chain between Jim Green and Kenneth Weckstein (HPA's attorney), July 20, 2017, Ex. 44.

[128] Email Chain between Jim Green and James Carver, April 29, 2016, Ex. 36.

was $227,304. I was hoping we could negotiate down from that figure which is why I left the amount blank."[129]

58. On May 27, 2016, HPA filed suit against Western in the Middle District of Florida.[130] In the introduction to the complaint, HPA stated that, after it exercised its right to terminate PASI:

> Thereafter, Harry Pepper made a timely demand that Western perform its obligations as Surety under the performance bond. The Bond required Western to act "promptly," but more than one year later, Western still has not performed its obligations to Harry Pepper under the performance bond. Worse yet, instead of helping to complete the construction project, as required by the Bond, Western prevented Harry Pepper from timely and cost-effectively completing the construction project. Specifically, Western asserted the right to select or approve a replacement contractor, but then did not do so. As a result of Western's breach of the Bond and its other promises to Harry Pepper, Harry Pepper's cost to complete its NASA contract has increased by approximately $2.25 million. In addition, NASA has asserted almost one million dollars in claims against Harry Pepper and Harry Pepper has lost goodwill of its customer, NASA. Finally, Harry Pepper has suffered delays and other damages that will be proven at trial. In all, Harry Pepper's damages as a result of Western's breaches exceed $4,000,000.[131]

HPA further asserted:

> . . .Had Western promptly denied liability to Harry Pepper and advised Harry Pepper that it would not pay for any replacement subcontract, Harry Pepper would have proceeded to enter into the replacement subcontracts with ADS and MNC for a total cost of $3,701,729. This would have resulted in a cost overrun (compared to PASI's Subcontract price) of approximately $250,000.
>
> . . . Instead, Western said that it would find a replacement contractor and was "going forward with the bid process." By so doing, Western admitted that it had an obligation under the bond, including finding a replacement

---

[129] Email Chain between Jim Green and James Carver, April 29, 2016, Ex. 36.

[130] *Harry Pepper & Associates, Inc. v. Western Surety Company*, No. 16-657 (M.D. Fla. May 27, 2015), Doc. 1 ("HPA Complaint"), Ex. 37.

[131] HPA Complaint 2, Ex. 37.

contractor.  Despite the above, Western never provided Harry Pepper with the name of a replacement contractor.

. . . Now, more than one year after Harry Pepper was ready to and proposed to contract with a ADS and MNC, and one year after Western told Harry Pepper not to enter into those replacement subcontracts because Western was starting the bid process to find a replacement contractor, the cost for the replacement work that was bid by ADS and MNC has increased from $3,701,729 to a projected amount of over $5.7 million. That increase in the cost of proposals that Harry Pepper is receiving in 2016 from the proposals received by Harry Pepper in March and April of 2015 is solely attributable to the acts of Western.  This will result in a cost overrun (compared to PASI's Subcontract price) of approximately $2.25 million.[132]

59. HPA's President and CEO testified that "HPA would not have filed the HPA v. WSC suit . . . but for the actions and inaction of the WSC in responding to HPA's claim against WSC" on the "Performance Bond . . . regarding the project[.]" [133]

60. Based on the exhibits, there is another gap in major activity between the May 27, 2016 HPA Complaint and the next relevant document in this suit from December 12, 2016.[134]

61. On December 12, 2016, Western's attorney sent AAA an R-7 request for Joinder with the HPA/PASI arbitration.[135]

62.  On December 16, 2016, Western's attorney emailed counsel for HPA and PASI requesting parties' approval for Western's joinder in the arbitration.[136]

---

[132] HPA Complaint ¶¶ 88–90, Ex. 37.

[133] HPA Dep. 8:17–22, Ex. 59.

[134] *See Federal Rule of Evidence Article 1006 Summary to Prove Content*, Doc. 46-1 at 2–3; *Joint Exhibit List*, Doc. 53 at 3.

[135] Email from Jim Green to S. Cleo Gladden (of AAA), December 12, 2016, Ex. 38.

[136] Email from Jim Green to multiple parties, December 16, 2016, Ex. 39.

63. On December 29, 2016, PASI wrote saying that it would not oppose Western joining in the arbitration.[137]

64. On January 10, 2017, PASI later objected to Western's joinder in arbitration.[138] Jim Carver said PASI could "no longer passively stand by. . . . This decision is made in response to the fact that Western is not willing to agree to the conditions previously set forth, including but not limited to that Western would not attempt to tax any of the costs of the arbitration to PASI."[139] PASI did express that it was "willing to work with Western on finding a comprehensive settlement of this whole matter, as long as Western cooperate[d] fully with PASI."[140]

65. On January 10, 2017, HPA also offered $2.5 Million to settle with Western.[141] Earlier in the email chain, HPA asserted on December 29, 2016, that "HPA ha[d] claims against Western that are separate from HPA's claims against PASI" and that "Even if AAA joined Western to the arbitration, that would not resolve HPA's separate claims against Western."[142]

66. On January 24, 2017, PASI's attorney wrote to AAA objecting to Western's joinder in the arbitration on the following grounds: (1) "There is no agreement to arbitrate that includes Western." (2) "Any claims Western may have against PASI or that PASI may

---

[137] Email Chain from Kenneth Weckstein to Jim Green, January 10, 2017, Ex. 41.

[138] Email from Jim Carver to Jim Green, January 10, 2017, Ex. 40.

[139] Email from Jim Carver to Jim Green, January 10, 2017, Ex. 40.

[140] Email from Jim Carver to Jim Green, January 10, 2017, Ex. 40.

[141] Email Chain from Kenneth Weckstein to Jim Green, January 10, 2017, Ex. 41.

[142] Email Chain from Kenneth Weckstein to Jim Green, January 10, 2017, Ex. 41.

have against Western are premature." (3) "Adding Western to this arbitration will make it unnecessarily more complicated."[143]

67. Again, there is a gap in the record of major activity from between PASI's January 24, 2017, email to the next document from July 18, 2017.[144]

68. On July 18, 2017, Western offered a settlement of "simply a walk away with HPA releasing WS from any liability[,]" with Western and HPA reserving their rights as to other parties.[145]

69. On July 21, 2017, Western offered $125,000 to settle with HPA.[146]

70. On July 26, 2017, HPA offered $1.6M to settle with Western, and Western's attorney responded with a request for a "current accounting of what HPA contend[ed] to be its loss."[147]

71. On August 9, 2017, Western offered $450,000 to settle with HPA.[148]

72. On August 10, 2017, HPA's attorney wrote that if Western offered to pay $1.6M before August 15, 2017, HPA would accept the offer.[149] HPA also accused Western of not dealing in good faith.[150]

---

[143] Email from James Carver to S. Cleo Gladden, January 24, 2017, Ex. 42.

[144] *See Fedral Rule of Evidence Article 1006 Summary to Prove Content*, Doc. 46-1 at 3; *Joint Exhibit List*, Doc. 53 at 3.

[145] Email from Jim Green to Kenneth Weckstein, July 18, 2017, Ex. 43.

[146] Email Chain from Jim Green to Kenneth Weckstein, July 21, 2017, Ex. 45.

[147] Email from Jim Green to Kenneth Weckstein, July 26, 2017, Ex. 46.

[148] Email Chain between Jim Green to Kenneth Weckstein, August 9, 2017, Ex. 47.

[149] Email Chain between Kenneth Weckstein and Jim Green, August 10, 2017, Ex. 48.

[150] Email Chain between Kenneth Weckstein and Jim Green, August 10, 2017, Ex. 48.

73. On August 14, 2017, after expressing disagreement with HPA's contentions, Western's attorney offered $1M to settle with HPA.[151]

74. On August 15, 2017, PASI's attorney emailed Western's asking if Western responded to HPA's " 'settlement' inquiry."[152] PASI's lawyer also said that, though he had not completed the promised analysis of HPA's claims, his "cursory review" was that they were "grossly inflated" and included items which were the fault of either third parties or HPA and delay damages that were not owed.[153]

75. On August 16, 2017, Western's attorney responded to PASI's that it had made a settlement counteroffer but that the numbers were confidential, particularly with PASI's decision not to participate in settlement negotiations.[154] Western's counsel also reiterated (1) PASI's liability for costs Western incurred and for the collateral, (2) the fact that there had been an Event of Default under the Indemnity Agreement, and (3) Western's right to settle under that contract.[155] Western emphasized that it was Western and PASI's burden to prove that HPA's termination for default was unreasonable and that, if they failed to do so, HPA's damages were likely "substantial," even if HPA's figures were inflated.[156] Western concluded with a reservation of rights.[157]

---

[151] Email from Jim Green to Kenneth Weckstein, August 14, 2017, Ex. 49.

[152] Email Chain between James Carver and Jim Green, August 16, 2017, Ex. 50.

[153] Email Chain between James Carver and Jim Green, August 16, 2017, Ex. 50.

[154] Email Chain between James Carver and Jim Green, August 16, 2017, Ex. 50.

[155] Email Chain between James Carver and Jim Green, August 16, 2017, Ex. 50.

[156] Email Chain between James Carver and Jim Green, August 16, 2017, Ex. 50.

[157] Email Chain between James Carver and Jim Green, August 16, 2017, Ex. 50.

76. On August 16, 2017, PASI's attorney responded that he was "disappointed in Western's position" and that PASI "may be a little more reluctant to continue this one way sharing" of PASI's "work product in the arbitration."[158]  PASI's lawyer concluded: "Please note that the direct claims made by HPA against Western (and the legal fees associated therewith) do not involve PASI, and we do not intend to accept any liability for them."[159]

77. On August 23, 2017, HPA's counsel sent a draft subpoena to Western (purporting to establish through exhibits that "Western is liable to Harry Pepper") and stated that $1.6M was HPA's bottom line, though indicating that he would explore with HPA "with it would be willing to 'split the difference' " with Western's offer of $1M.[160]

78. On August 29, 2017, HPA's lawyer wrote that it would accept payment of $1.3M from Western to settle.[161]

79. On August 29, 2017, Western's counsel confirmed that it would pay HPA $1.3M to settle, subject to "acceptable release language."[162]  Western's counsel also asked "HPA [to] keep the compromise confidential, at least until consummated."[163]

80. HPA and Western entered into its settlement agreement (the "HPA-Western Settlement Agreement"), effective August 29, 2017.[164]

---

[158] Email Chain between James Carver and Jim Green, August 16, 2017, Ex. 50.

[159] Email Chain between James Carver and Jim Green, August 16, 2017, Ex. 50.

[160] Email from Kenneth Weckstein to Jim Green, August 23, 2017, Ex. 51.

[161] Email from Kenneth Weckstein to Jim Green, August 29, 2017, Ex. 52.

[162] Email Chain between Jim Green and Kenneth Weckstein, August 29, 2017, Ex. 53.

[163] Email Chain between Jim Green and Kenneth Weckstein, August 29, 2017, Ex. 53.

[164] HPA-Western Settlement Agreement 1, Ex. 54.

81. The recital of the settlement agreement contains the following:

> On or about August 27, 2015, HPA filed a Demand for Arbitration against PASI with the American Arbitration Association ("HPA Arbitration Demand"). The HPA Arbitration Demand sought damages relating to lead contamination that HPA asserted was caused by PASI and delay damages from such contamination. Those damages were claimed in paragraphs 4, 5, and 7 of the HPA Arbitration Demand ("Contamination Damages"). The HPA Demand was also sought damages in paragraph 6 for excess re-procurement costs to complete PASI's scope of work ("Re-procurement Costs"). The HPA Arbitration Demand was docketed as AAA No. 01-15-0004-7930. . . .

> The HPA Lawsuit [between HPA and Western] seeks recovery from Western of the Re-procurement Costs covered by paragraph 6 of the HPA Arbitration Demand, delay damages, claims by NASA and others against HPA, costs, fees and asserts that Western breached its obligations relating to the Bonds. Western denies the allegations in the HPA Lawsuit.[165]

82. Western's payment to HPA was in full and final settlement of all claims between Harry Pepper and Western.[166] Specifically, in exchange for the sum of $1.3 million, the parties agreed to file a stipulation of dismissal to dismiss the HPA Lawsuit with prejudice.[167]

The parties also agreed:

> [U]pon receipt by HPA of the foregoing payment, the Parties each shall release each other . . . of and from any and all past, present or future claims, demands, obligations . . . and all other associated expenses of any type or kind, known or unknown, foreseen or unforeseen, . . . which the Parties or either Party had, has, can, shall or may have had against the Released Parties, for, upon or by any reason or any matter, cause or thing whatsoever, which arise out of or are related to the bonds, the Subcontract, the Prime Contract, the HPA Lawsuit, or the AAA Arbitration.[168]

83. Nevertheless, in the section titled "AAA Arbitration," the parties agreed:

---

[165] HPA-Western Settlement Agreement 1–2, Ex. 54.

[166] Jortner Aff. ¶ 17, Doc. 40-1. *See* HPA-Western Settlement Agreement, Ex. 54.

[167] HPA-Western Settlement Agreement §§ 1, 2, Ex. 54.

[168] HPA-Western Settlement Agreement § 4 Ex. 54.

> Notwithstanding anything in this Agreement to the contrary, the Parties agree that HPA will have the right to continue to assert and prosecute the HPA Arbitration Demand against PASI for Contamination Damages, PASI will have the right to continue to assert and prosecute the PASI Counterclaim against HPA, and the right to continue to assert all defenses and set-offs against the HPA claim and HPA will have the right to continue to assert all defenses and set-offs against the PASI Counterclaim.[169]

84. At the hearing, Jortner and Carver provided conflicting testimony as to the extent to which the HPA-Western Settlement Agreement resolved claims by HPA against PASI.

85. On September 21, 2017, Western made the settlement payment of $1.3M to HPA.[170]

### F. Procedural History and Outcome of the HPA/PASI Arbitration

86. After Western had settled away its liability to HPA, on September 15, 2017, Western filed a lawsuit against the same group of PASI-related parties who are the Defendants in this present lawsuit.[171] This lawsuit sought damages in the amount of $122,394.97, which Western alleged constituted the attorney's fees, costs, and expenses of its involvement related to the Bond claim. Western also sought "all additional losses, costs, expenses and attorney' fees which Western may incur as a result of having issued the Subcontract Performance and/or Subcontract Payment Bonds," plus interests and costs. This lawsuit did not, however, include a demand for a demand for a preliminary injunction.

87. On October 3, 2017, Western sought dismissal of this lawsuit without prejudice.[172]

---

[169] HPA-Western Settlement Agreement § 5 Ex. 54.

[170] Letter from Jim Green to HPA, September 21, 2017, Ex. 56.

[171] *Western Surety Co. v. PASI of LA, Inc.* No. 17-614-JWD-RLB (M.D. La. Sept. 5, 2017) ("*Original Western-PASI Action*"), *Complaint*, Doc. 1.

[172] *Original Western-PASI Action*, *Notice of Voluntary Dismissal Without Prejudice*, Doc. 15.

88. On October 4, 2017, Western sought leave to file an amended notice of voluntary dismissal,[173] which was granted by this Court.[174] The amended notice stated that "Western advises the Court of its intention to refile this action after additional research and investigation are complete."[175]

89. On October 25, 2017, the Court approved of the voluntary dismissal.[176]

90. On November 9, 2017, Western filed the instant action against PASI.[177]

91. On December 7, 2017, Western filed the instant motion for a preliminary injunction.[178]

In the motion, Western sought an order compelling PASI:

> (1) to deposit sufficient collateral to protect Western from the loss suffered . . . ; (2) to deposit the funds of the bonded Subcontract . . . , including the proceeds of any Arbitration award or settlement in a trust account; (3) the delivery of the assigned proceeds of the bonded Subcontract from the Arbitration, to the extent of Western's loss; and (4) pending the above, enjoining and restraining Indemnitors from transferring, disposing, or otherwise disbursing the proceeds of the bonded Subcontract, as required by the Indemnity Agreement and the law.[179]

92. On December 7, 2017, Western filed a motion for expedited hearing on the motion.[180]

Western argued that it would suffer irreparable injury if denied expedited consideration

---

[173] *Original Western-PASI Action, Motion for Leave to File Rule 41(a)(1)(A)(i) Amended Notice of Voluntary Dismissal Without Prejudice,* Doc. 17.

[174] *Original Western-PASI Action*, *Order*, October 5, 2017, Doc. 18.

[175] *Original Western-PASI Action*, *Amended Notice of Voluntary Dismissal Without Prejudice*, Doc. 19 at 1.

[176] *Original Western-PASI Action*, *Order*, October 25, 2017, Doc. 20.

[177] *Complaint*, Doc. 1.

[178] *Western Surety Company's Motion for Preliminary Injunction*, Doc. 11.

[179] *Western Surety Company's Motion for Preliminary Injunction*, Doc. 11 at 1–2.

[180] *Motion for Expedited Hearing/Submission*, Doc. 12.

and that the same interests underlying its motion for preliminary injunction justified an expedited hearing.[181]

93. On December 12, 2017, then Chief Judge Jackson denied the request for expedited consideration.[182] In the ruling, Judge Jackson explained that "Defendants have refused to deposit collateral since October 1, 2015, more than two years ago. Western first requested a preliminary injunction against Defendants on December 7, 2017, despite being engaged in litigation with Harry Pepper since May 27, 2016, and having settled that suit on August 29, 2017."[183] The Court noted that it was unclear from the record whether Western was denied the right to intervene in arbitration before or after filing suit against the Defendants, so the Court could not determine if there was a change in circumstances justifying expedited consideration.[184] Further, Western admitted that arbitration was ongoing and that there was no indication that a resolution was imminent.[185]

94. Western filed no motion to reconsider Judge Jackson's order on its *Motion for Expedited Hearing/Submission*, nor did Western submit additional evidence or argument to address Judge Jackson's concerns.

95. On January 10, 2018, undersigned held a status conference with the parties to discuss the motion for preliminary injunction.[186] The parties requested a hearing, and the Court

---

[181] *Memorandum in Support of Motion for Expedited Hearing/Submission,* Doc. 12-1 at 1.

[182] *Ruling and Order*, December 12, 2017, Doc. 16.

[183] *Ruling and Order*, December 12, 2017, Doc. 16 at 2.

[184] *Ruling and Order*, December 12, 2017, Doc. 16 at 2–3.

[185] *Ruling and Order*, December 12, 2017, Doc. 16 at 3.

[186] *Minute Entry*, January 10, 2018, Doc. 22.

allowed ninety days to complete discovery, followed by thirty days for simultaneous briefs and fourteen days for a reply.[187]  The motion for preliminary injunction was set for hearing on June 22, 2018.[188]

96. On January 15, 2018, the arbitration award in the case between HPA and PASI issued.[189]

97. The arbitration panel issued certain conclusions of law which included: (1) "HPA has failed to prove with reasonable certainty that PASI's work caused environmental lead contamination of the B2 test stand beyond the level of what was pre-existing on site prior to and to the exclusion of the work of other contractors." ; (2) PASI performed its work in accordance with the contract documents, in a good and workman-like manner and per industry standards."; (3) "HPA materially breached its subcontract with PASI by failing to allow PASI the opportunity to cure any deficiencies in its work."; (4) "HPA materially breached its subcontract with PASI by wrongfully terminating the subcontract."[190]

98. In the Award, the arbitration panel ordered HPA to pay PASI a variety of damages amounting to $2,276,213, itemized as follows:

Increased Labor Costs $ 25,934
Loss of Profits $ 510,000
Bond Fee $ 27,459
Training/Certificates $ 6,425
Changed Work $ 24,570
Loss Use of Equipment $ 26,100
Project Specific Equipment $ 90,000
Lost Reputation $ 925,000
Attorney's Fees $ 316,633
Miller Act $ 324,092

---

[187] *Minute Entry*, January 10, 2018, Doc. 22.

[188] *Minute Entry*, January 10, 2018, Doc. 22.

[189] Alexander Aff.  ¶ 11, Doc. 41-1 at 11–22; Arbitration Award, Ex. 58.

[190] Arbitration Award 10, Ex. 58.

TOTAL $2,276,213[191]

99. On January 23, 2018, a scheduling order was issued by the Magistrate Judge establishing a discovery deadline of October 26, 2018.[192]

100. On April 4, 2018, Western Surety filed an unopposed motion to continue the preliminary injunction hearing and all prehearing deadlines.[193] Western represented that all parties agreed to the continuance because of the parties' efforts to settle the matter.[194] Western further requested that all pre-hearing deadlines be extended ninety days.[195]

101. The following day, Western's motion to continue was granted.[196] The hearing on the preliminary injunction was set for September 21, 2018, and all pre-hearing deadlines were extended by ninety days.[197]

### G. Alleged Loses by Western and PASI's Current Solvency

102. According to Laurence Jortner, to date, despite Western's demands, Indemnitors have not deposited any collateral with Western, or deposited any funds in trust, or held Western harmless for the claims asserted.[198]

103. Jortner attests that, to date, Western has incurred attorneys' fees, investigative and

---

[191] Arbitration Award 10–11, Ex. 58.

[192] *Order*, January 23, 2018, Doc. 24.

[193] *Unopposed Motion to Continue Preliminary Injunction and Preliminary Injunction Deadlines* ("*Unopposed Motion to Continue*"), April 4, 2018, Doc. 26.

[194] *Unopposed Motion to Continue*, Doc. 26 at 1.

[195] *Unopposed Motion to Continue*, Doc. 26 at 1.

[196] *Order*, April 5, 2018, Doc. 27.

[197] *Order*, April 5, 2018, Doc. 27.

[198] Jortner Aff. ¶ 22, Doc. 40-1.

adjustment costs of $155,820.97, of which it has been reimbursed only $29,000.00, resulting in a net Loss, as defined under the Indemnity Agreement, including the amount paid by Western to Harry Pepper pursuant to the Settlement Agreement, of $1,426,820.97 as of the date of his affidavit (August 3, 2018).[199]

104.    Alexander testified at the hearing about two of the Indemnitors: PASI and Professional.

105.    PASI was formed solely for the Project and is currently performing no other projects. Professional has numerous projects for sandblasting and painting.

106.    Alexander estimated that, of the Arbitration Award moneys received by PASI, between $1.7M and $2M is currently being held in PASI's account. PASI has no plans to use the money prior to trial other than to pay miscellaneous expenses. Further, there are no plans to liquidate PASI.

## II.    CONCLUSIONS OF LAW

### A.    Preliminary Injunction Standard

107.    "To obtain a preliminary injunction, the plaintiff must show 1) that there is a substantial likelihood that it will succeed on the merits, 2) that there is a substantial threat that it will suffer irreparable injury if the district court does not grant the injunction, 3) that the threatened injury to the plaintiff outweighs the threatened injury to the defendant, and 4) that granting the preliminary injunction will not disserve the public interest."[200]

---

[199] Jortner Aff. ¶ 20, Doc. 40-1.

[200] *Sierra Club, Lone Star Chapter*, 992 F.2d at 551 (citing *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974)).

108.     "[A] preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements."[201] "Otherwise stated, if a party fails to meet *any* of the four requirements, the court cannot grant the . . . preliminary injunction."[202]

109.     The Fifth Circuit has said:

> Our review is deferential: "A district court's determination as to each of the elements required for a preliminary injunction are mixed questions of fact and law, the facts of which this Court leaves undisturbed unless clearly erroneous. Conclusions of law made with respect to denial of a preliminary injunction are reviewed *de novo*. The ultimate decision for or against issuing a preliminary injunction is reviewed under an abuse of discretion standard."[203]

## B. Substantial Threat of Irreparable Injury

### 1. Parties' Arguments

110.     Western argues that "The objectives of the assignment and collateral security provision include insuring that the surety is fully protected from any loss that might result from the indemnitors' insolvency and/or dissipation of assets, as well as motivating the

---

[201] *Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*, 577 F.3d 250, 253 (5th Cir. 2009) (stating that it has "cautioned" this point "repeatedly") (quoting *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 195–96 (5th Cir. 2003)); *See also Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985) ("Injunctive relief is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." (citing 7 Moore's Federal Practice ¶ 65.04(s) (1982); 11 C. Wright & A. Miller, Federal Practice and Procedure § 2942 at 368 (1973)); *Gonannies, Inc. v. Goupair.Com, Inc.*, 464 F. Supp. 2d 603, 607 (N.D. Tex. 2006) ("The party seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated before a . . . preliminary injunction can be granted" (citing *Mississippi Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985); *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987)).

[202] *Gonannies,* 464 F. Supp. 2d at 607 (emphasis in original).

[203] *Bluefield Water Ass'n,*, 577 F.3d at 253 (quoting *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 463 (5th Cir. 2003) (internal citations omitted)).

indemnitors to promptly resolve outstanding claims."[204]  Western further asserts: "Western will continue to suffer irreparable harm unless Indemnitors are compelled to deposit collateral to the extent of the Loss with Western or into the Registry of the Court and are enjoined and restrained from transferring, disposing, disbursing the proceeds of the bonded Subcontract, including but not limited to the proceeds of the Arbitration Award up to the amount of the Loss."[205]

111.     PASI contends that Western's desired relief—the cost of settlement, expenses, and attorneys' fees—are all monetary damages for which there is a remedy at law.  PASI further asserts that, under analogous case law from other jurisdictions, sureties must establish irreparable harm through evidence that there is a "specific and heightened risk that it will not recover at judgment—i.e., evidence of the principal's insolvency, financial 'dire straits,' or secretion of assets."[206]  According to PASI, this case law is in line with the general rules governing irreparable harm in the Fifth Circuit.  Here, PASI says, Western has no evidence of a heightened collection risk.  PASI also maintains that Western has delayed in seeking injunctive relief and that this weighs against granting an injunction.

112.     In response, Western argues (1) other cases recognize that a surety will suffer irreparable injury if denied its collateral, and, "[a]t a minimum, [the] money [in this case] should be set aside and preserved until final resolution, and (2) in any event, Western has not delayed in this case, as it (a) moved for a preliminary injunction two months after

---

[204] *Western's PFFCL*, Doc. 40 at 10.

[205] *Western's PFFCL*, Doc. 40 at 11.

[206] *PASI's PFFCL*, Doc. 41 at 16 (citations omitted).

settling with HPA and before the Arbitration award; (b) sought expedited consideration of its motion; and (c) the hearing was only postponed because of discovery and settlement efforts.

113.     In reply, PASI maintains that Western must show that the "harm suffered between the time of suit and the time of ultimate decision in this case would seriously prejudice [plaintiff's] opportunity for full recovery."[207]

### 2. Irreparable Harm Generally

114.     "Irreparable harm requires a showing that: (1) the harm to Plaintiff[] is imminent (2) the injury would be irreparable and (3) that Plaintiff[] ha[s] no other adequate legal remedy."[208]

115.     "An injury is 'irreparable' only if it cannot be undone through monetary remedies."[209]

116.     "[S]peculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant."[210]

117.     Further, a party seeking a preliminary injunction does not suffer irreparable harm if "[t]here is nothing to suggest that harm suffered between the time of suit and the time of ultimate decision in this case would seriously prejudice [mover's] opportunity for full recovery" because, "in traditional terms of equity, the remedy at law is adequate."[211]

---

[207] *PASI's Resp.*, Doc. 47 at 2 (quoting *Bluefield Water Ass'n,*, 577 F.3d at 253).

[208] *Gonannies*, 464 F. Supp. 2d at 608 (citing *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975)).

[209] *City of Meridian, Miss. v. Algernon Blair, Inc.*, 721 F.2d 525, 529 (5th Cir. 1983) (quoting *Deerfield Medical Ctr. v. City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir. 1981)).

[210] *Holland Am. Ins. Co.,* 777 F.2d at 997 (citing *Carter v. Heard*, 593 F.2d 10, 12 (5th Cir. 1979).

[211] *See Bluefield Water Ass'n*, 577 F.3d at 253.

### 3. Summary of Ruling

118.      Here, the central issue of irreparable harm turns on two key questions: (1) does a surety need to make a specific showing of irreparable harm when an indemnitor fails to provide security? and (2) has Western sufficiently delayed pursuing an injunction to the point that it no longer can claim irreparable injury?

119.      In sum, having carefully considered the law, the facts in the record, and the arguments and submissions of the parties, the Court finds that Western has failed to meet its burden of clearly showing irreparable injury. First, Western has failed to show that it is entitled to an injunction purely by virtue of its status as a surety. Rather, Western must demonstrate that it faces some risk that PASI will ultimately be unable to pay a judgment if liable, and Western has failed to do so. Second, the Court finds that PASI has unreasonably delayed seeking a preliminary injunction without adequate justification.

120.      Given the Court's finding on the issue of irreparable injury, it need not resolve whether Western has sufficiently demonstrated the other requirements of a preliminary injunction.

### 4. A Surety's Showing of Irreparable Injury

121.      The parties cite conflicting case law on whether a surety suffers irreparable injury upon the obligor's failure to provide collateral.

122.      Western cites to several cases supporting the view that a surety is entitled to specific performance on the collateral obligation. In *Employers Mutual Casualty Co. v. Precision Construction. & Maintenance, LLC*, the Eastern District of Louisiana provided an extensive discussion of this line of cases:

> The primary issue, then, is whether plaintiff has an adequate remedy at law for defendants' failure to post collateral security. Plaintiff argues that its

legal remedies are inadequate because a claim for money damages would deprive plaintiff of its prejudgment right to collateralization. This argument finds support in an extensive body of case law. Courts have generally held that a surety is entitled to specific performance of a collateralization right because specific performance is necessary to protect the surety's bargained-for right to prejudgment relief. *See e.g.,* [*Safeco Ins. Co. of Am. v. Schwab*, 739 F.2d 431, 433 (9th Cir. 1984)] ("Sureties are ordinarily entitled to specific performance of collateral security clauses."); [*Safeco Ins. Co. of Am. v. Lake Asphalt Paving & Const., LLC*, 807 F. Supp. 2d 820, 827 (E.D. Mo. 2011)] ("[T]he law favors protecting a surety's right to collateralization by granting specific performance."); *Liberty Mut. Ins. Co. v. Aventura Eng'g & Const. Corp.,* 534 F. Supp. 2d 1290, 1320 (S.D. Fla. 2008) ("[C]ase law nationwide has affirmed the availability of [specific performance]" in an action to compel an indemnitor to post collateral); *Liberty Mut. Ins. Co. v. Nat'l Pers. of Tex., Inc.,* 2004 WL 583531, at *2 (N.D. Tex. Mar.24, 2004) ("Courts have generally granted specific performance to enforce collateral security clauses based on the premise that such remedy is required to protect the benefit of the surety's bargain").

The Court recognizes that there is a contrary minority position. Some courts have refused to specifically enforce collateral security provisions absent a specific showing by the surety as to why the surety's remedies at law are inadequate. *See e.g., Safeco Ins. Co. of Am. v. Mountaineer Grading Co.,* 2012 WL 830158, at * 10 (S.D.W.Va. March 9, 2012) (holding that a surety failed to demonstrate an entitlement to specific performance when it asserted only that indemnitors failed to provide collateral security upon demand and did not offer any evidence demonstrating why its legal remedies were inadequate). These cases do not give sufficient weight to the nature of the surety's right to right to collateral security. As the majority position recognizes, a surety's claim for collateralization is not just an issue of monetary loss, which can be remedied by monetary damages; rather, it is an issue of protecting the surety's expectations under the indemnity contract. *See* [*Travelers Cas. & Sur. Co. v. Ockerlund,* No. 04 C 3963, 2004 WL 1794915, at *6 (N.D. Ill. Aug.6, 2004)]. A surety who holds a contractual right to demand collateral security has specifically bargained for a contractual right to prejudgment relief. So if the surety is "to have the security position for which he bargained, the promise to maintain the security must be specifically enforced." *Safeco,* 807 F. Supp. 2d at 827; *see also Ohio Cas. Ins. Co. v. Fratarcangelo,* 7 F. Supp. 3d 206, 214 (D. Conn. 2014) (concluding that because a surety had bargained for prejudgment collateralization, a judgment for money damages alone would deprive the surety of prejudgment relief to which it is contractually entitled).

Plaintiff [insurer] in this case bargained for the right to demand and receive funds, which it could use to pay losses that it anticipated incurring on the Yacht Harbor Bond. That bargain will be frustrated if plaintiff is required

to "suffer any loss, even if only temporary, associated with the performance of the primary obligor's duty." *Travelers v. Ockerlund,* 2004 WL 1794915, at *4. Thus, the Court finds that plaintiff's legal remedies are inadequate. While plaintiff may be entitled to money damages in this matter, an award of damages after trial does not adequately vindicate the plaintiff's right to collateralization. *See Ohio,* 7 F.Supp.3d at 214 (noting that surety's true injury the loss of its bargained-for and contractually-guaranteed position as a secured creditor," a loss that cannot be rectified post judgment). Plaintiff is therefore entitled to the injunctive relief its seeks.[212]

123.    The *Employers Mutual Casualty* court ultimately held that the insurer was entitled to specific performance as a matter of state law even without a showing of irreparable injury under federal injunction law.[213]    In granting the motion for partial summary judgment, the court explained:

> Defendants resist this conclusion by arguing that plaintiffs have not made the showings required for a preliminary injunction. Defendants cite a Florida district court case for the proposition that "a party seeking entry of a preliminary injunction must establish (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not granted, (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party, and (4) if issued, the injunction would not be adverse to the public interest." *Developers Sur. & Indem. Co. v. Hansel Innovations, Inc.,* No. 8:14–CV–425–T–23TBM, 2014 WL 2968138, at *4 (M.D. Fla. July 1, 2014). Defendants misconstrue the nature of plaintiff's motion. Plaintiff does not seek a preliminary injunction but, rather, specific performance of its right to collateral security. As discussed in Section III.B.1 above, a party's entitlement to specific performance is governed by state law, not the federal standards for granting injunctive relief under Rule 65 of the Federal Rules of Civil Procedure. *See e.g.,* [*Horner v. Bourland*, 724 F.2d 1142, 1144–45 (5th Cir. 1984)]. Thus, courts in this circuit and others have repeatedly granted specific enforcement of collateral security provisions, as long as specific performance is available under state law. [(citations omitted).] Here, plaintiff has established that it is entitled under Iowa law to specific performance of its contractual right to collateral security.

---

[212] *Employers Mut. Cas. Co. v. Precision Const. & Maint., LLC,* 2015 WL 5254706, at *9–10.

[213] *Id.* at *10.

Plaintiff does not need to make any additional showing to obtain its requested relief.[214]

124.     Nevertheless, other courts have evaluated indemnity contracts of this type and found that a surety suffered irreparable injury by the obligor's failure to provide collateral.[215]

125.     Conversely, PASI identifies authority finding that an indemnitor's failure to provide security is not, by itself, irreparable injury. A recent District of Nebraska case, *Allied World Specialty Insurance Co. v. Abat Lerew Construction, LLC*,[216] provides an extensive discussion of this line of cases:

> "While a surety need not sustain a loss from its own pocket before it can raise a claim demanding specific enforcement of an indemnity agreement, the fact that the claim exists does not establish irreparable injury for purposes of injunctive relief." *Ohio Cas. Ins. Co. v. Campbell's Siding & Windows*, No. 1:15-CV-00255-EJL, 2015 WL 6758137, at *3 (D. Idaho Nov. 4, 2015) (citation omitted) (finding surety's "motion only seeks injunctive relief to require the payment of collateral security which is an economic injury and not irreparable"); *see Travelers Cas. & Sur. Co. of America v. W.P. Rowland Constructors Corp.*, No. CV-12-0390-PHX-FJM, 2012 WL 1718630, at *3 (D. Ariz. May 15, 2012) (denying injunctive relief of collateralization to a surety); *Hudson Insur. Co. v. Simmons Constr.*, LLC, No. CV12–407–PHX–GMS, 2012 WL 869383, at *4 (D. Ariz. March 14, 2012) (finding no authority for preliminary injunctive relief for collateralization); *Hanover Ins. Co. v. TLC Investing, LLC*, No. 2:11-CV-00711-JCM-LRL, 2011 WL 3841299, at *1 (D. Nev. Aug. 26, 2011) (denying reconsideration of a denial of preliminary injunction based on failure to show irreparable harm).

---

[214] *Id.*

[215] *See Travelers Cas. & Sur. Co. v. Ockerlund*, 2004 WL 1794915, at *5; *Int'l Fid. Ins. Co. v. Anchor Envtl., Inc.*, No. 07-04750, 2008 WL 1931004, at *7 (E.D. Pa. May 1, 2008); *Great Am. Ins. Co. v. SRS, Inc.*, No. 11-970, 2011 WL 6754072, at *8 (M.D. Tenn. Dec. 23, 2011) ("courts have routinely found that sureties suffer immediate, irreparable harm if they are denied receipt of collateral after liability has been asserted against them" (collecting cases)); *Int'l Fid. Ins. Co. v. Sols. to Every Problem, Inc.*, No. 12-37, 2012 WL 2576775, at *7 (E.D. Tenn. July 3, 2012).

[216] *Allied World Specialty Ins. Co. v. Abat Lerew Constr., LLC*, No. 16-545, 2017 WL 1476131 (D. Neb. Apr. 24, 2017).

"Cases discussing preliminary injunctions have held that a preliminary injunction is warranted to enforce a surety's rights if the principal is insolvent or secreting assets." *Aventura Eng'g*, 534 F. Supp. 2d at 1321–22; *see also Travelers Cas. & Sur. Co. v. Ockerlund*, No. 04–C–3963, 2004 WL 1794915, at *5 (N.D. Ill. Aug. 6, 2004) (issuing preliminary injunction requiring indemnitor to post collateral in the absence of any defenses or any argument that the indemnity agreement was unenforceable). Courts granting preliminary injunctive relief under Federal Rule of Civil Procedure 65 generally require some showing of irreparable harm such as evidence that establishes that the indemnitor is in dire financial straits, no longer has a traditional source of credit, has been dishonest or "is millions of dollars in the hole with various creditors." *W. Sur. Co. v. Futurenet Grp., Inc.*, No. 16-CV-11055, 2016 WL 3180188, at *7 (E.D. Mich. June 8, 2016) (enjoining the indemnitors, after a hearing, from transferring or encumbering their assets, but not requiring them to post collateral); *Allied World Specialty Ins. Co. v. Lawson Inv. Grp., Inc.*, No. 6:15-CV-1397-Orl-37TBS, 2016 WL 695980, at *4 (M.D. Fla. Feb. 22, 2016) (granting motion for preliminary injunction on a finding that indemnitors had filed or sought protection in bankruptcy court and assets were likely to be dissipated).

A showing that a surety is not likely to incur any damages beyond the economic cost of paying the bond claims prior to receiving collateral " 'does not support a finding of irreparable harm, because such injury can be remedied by a damage award.' " *Travelers Cas. & Sur. Co. of Am. v. W.P. Rowland Constructors Corp.*, No. CV 12-00390-PHX-FJM, 2012 WL 1718630, at *3 (D. Ariz. May 15, 2012) (quoting *Rent–A–Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)). A showing that a surety will suffer extreme or very serious damage that would justify a mandatory injunction requiring the deposit of collateral would include, for example, establishing that it does not possess sufficient funds to pay the bond claims or showing that the injury sustained by the indemnitor's failure to provide collateral is incapable of being compensated with money damages. *Id.* " '[T]he fact that plaintiff may, in the interim, be marginally less secure with respect to the availability of a final money judgment [or decree], does not constitute "irreparable harm" so as to warrant the extraordinary remedy of a preliminary injunction.' " *Great Am. Ins. Co. v. Fountain Eng'g, Inc.*, No. 15-CIV-10068-JLK, 2015 WL 6395283, at *3 (S.D. Fla. Oct. 22, 2015) (quoting *Firemen's Ins. Co. v. Keating*, 753 F. Supp. 1146, 1157 (S.D.N.Y. 1990)). The purpose of a collateral security clause is to provide sureties with access to financial cushioning during the pendency of claims and, where violated, the surety suffers ongoing harm in the form of missing money, but, whatever the loss, whether to financial security or otherwise, it is monetary in character, and may be adequately remedied by a judgment on the merits. *Id.*[217]

---

[217] *Id.* at *4.

126.    Thus, in *Allied World*, the Court denied the motion for preliminary injunction for lack of a showing of irreparable harm.[218]  The Court so ruled because (1) the surety had not shown "the defendants are insolvent or disposing of or secreting assets"[219]; (2) the surety "concede[d] that it ha[d] not paid out any claims and [was] in the process of investigating the claims"; and (3) the defendant had "express[ed] some willingness to resolve the issues and fulfill its admitted obligations."[220]  Further, the fact that the surety was entitled under state law "to the equitable remedy of specific performance after proving its case, does not mean that an order granting specific performance is appropriate or necessary at this time."[221]  "[The Surety] ha[d] not established that it [could not] be compensated for the indemnitor's failure to provide collateral with money damages or with an order of specific performance after resolution of the merits."[222] The Court also stated that "The cases that grant specific performance of a collateralization clause generally involve motions for summary judgment and a full development of the record. Defendants have raised issues of good faith and inequitable conduct, as well as a public policy argument, that deserve fuller consideration."[223]  The motion was ultimately denied "without prejudice to reassertion."[224]

---

[218] *Id.* at *5.

[219] *Id.*

[220] *Id.*

[221] *Id.*

[222] *Allied World*, 2017 WL 1476131, at *5.

[223] *Id.*

[224] *Id.* at *6.

127.     Looking at these authorities, the Court finds that *Allied World* provides the appropriate standard (and, indeed, one consistent with the general rules governing preliminary injunctions articulated above). Unlike *Employers Mutual Casualty*, Western is not seeking specific performance of the Indemnity Agreement through a motion for summary judgment.  Rather, as in *Allied World*, Western is seeking a preliminary injunction, which requires a clear showing of irreparable harm.

128.     Western has failed to meet its burden on this issue. Like *Allied World*, Western has failed to put forward any evidence that PASI is currently "insolvent or disposing of or secreting assets"[225]  There is no proof that PASI is presently "in dire financial straits, no longer has a traditional source of credit, has been dishonest or 'is millions of dollars in the hole with various creditors.' "[226]

129.     To the contrary, the present need for an injunction is considerably *less* now than it was at the time Western made its initial demand.  While there is some evidence in the record of PASI's potential insolvency years ago,[227] now, according to Alexander's testimony, PASI is in possession of between $1.7M and $2M of the Arbitration Award, with no plans to spend any of the money before trial.  The Court found this testimony credible.

130.     Further, as in *Allied World*,  the Court finds that there are two pivotal issues that are more appropriately resolved at the stage of "motions for summary judgment and a full

---

[225] *Id.* at *5.

[226] *Id.* (citations omitted).

[227] *See* Email Chain from Jim Carver to Laurence Jortner, October 7–8, 2015, Ex. 28 ("Just a reminder note; PASI does not have the money to pay the demand by Friday.  If Western were to force the issue it would drive PASI and the other companies and the individuals into bankruptcy.").

development of the record."[228]  Here, "Loss" is defined in the Indemnity Agreement to include "any other cost incurred by the Surety in good faith as a result of having issued or procured the issuance of a Bond.[229]  Thus, there are two key issues.  First, under *Great American Insurance Co. v. McElwee Bros, Inc* .(which this Court finds controlling), Indemnitors have the burden of proving bad faith on Western's part.[230]  Second, Western has the burden of proving causation.[231]  While the Court likely agrees that PASI has failed to prove bad faith at this stage,[232] PASI has raised considerable questions and uncertainty about the issue of whether the bulk of Western's losses were truly "incurred . . . as a result of having issued or procured the issuance of a Bond"[233] and not, as PASI

---

[228] *Allied World*, 2017 WL 1476131, at *5.

[229] Indemnity Agreement § 1, Ex. 1.

[230] *Great Am. Ins. Co. v. McElwee Bros, Inc.*, No. 03-2793, 2007 WL 861152, at *5 (E.D. La. Mar. 19, 2007) ("In the suretyship context, lack of good faith carries an implication of a dishonest purpose, a conscious doing of wrong, a breach of a duty through motives of self-interest or ill will.  Moreover, a lack of diligence or negligence is not the equivalent of bad faith, indeed even gross negligence cannot support a finding of bad faith." (quoting *Frontier Ins. Co. v. International, Inc.*, 124 F. Supp. 2d 1211 (N.D.Ala.2000) (emphasis, internal citations and quotations omitted)).

[231] *See Gray Ins. Co. v. Terry*, No. 07-1523, 2014 WL 906481, at *6 (W.D. La. Mar. 6, 2014), *aff'd,* 606 F. App'x 188 (5th Cir. 2015) (stating "Thus, the question under this provision is essentially one of causality. An indemnification obligation will exist if the expense incurred by [insurer] would not exist but for [the insurer's] having issued payment and performance bonds to the defendants" and finding, at the summary judgment stage, that "the expenses that [insurer] incurred on the aforementioned projects . . . were all incurred because of [insurer's] having furnished the subject bonds to the defendants.").

[232] PASI's "reliance on codal suretyship arguments is misplaced." *Abbott v. Equity Grp., Inc.*, 2 F.3d 613, 627 (5th Cir. 1993).  "[A] contract on indemnity is different from a contract on suretyship[.]" *Id.* " ['·]The contract of indemnity forms the law between the parties and must be interpreted according to its own terms and conditions.. . . . [I]n an indemnity contract, the principal and indemnitors can be bound to the surety in any manner they elect in consideration of the surety issuing the bond covering the principal obligation.' " *Id.* (quoting *Commercial Union Ins. Co. v. Melikyan*, 430 So. 2d 1217, 1221 (La. App. 1 Cir. 1983).

[233] Indemnity Agreement § 1, Ex. 1.

contends, the result of Western's own breach of its obligations under the Bond.[234] Considering the fact that discovery has not even closed at this point,[235] the Court finds that issuing a preliminary injunction at this stage with an incomplete record would be ill-advised.

131.      The Court notes a final reason for following *Allied World* over *Employers Mutual Casualty*.  While the Court does not doubt a surety's entitlement to specific performance on the issue of collateralization under state law, the issue here is whether that state law trumps Rule 65's requirement for a substantial threat of irreparable injury if the injunction is not granted.

132.      In *Passmore v. Baylor Health Care System*, the Fifth Circuit explained: "A federal court entertaining state law claims cannot apply a state law or rule if (1) the state law or rule 'direct[ly] colli[des]' with a Federal Rule of Civil Procedure and (2) the Federal Rule 'represents a valid exercise of Congress' rulemaking authority.' "[236]  There is no serious dispute as to the second issue.[237]

---

[234] *See* HPA Complaint 2, ¶¶ 88–90, Ex. 37; HPA Dep. 7:23–8:22, Ex. 59.

[235] *Order*, January 23, 2018, Doc. 24 (scheduling order setting October 26, 2018, discovery deadline and a March 1, 2019, expert discovery deadline).

[236] *Passmore v. Baylor Health Care Sys.*, 823 F.3d 292, 296 (5th Cir. 2016) (quoting *Burlington N. R.R. Co. v. Woods,* 480 U.S. 1, 4–5, 107 S. Ct. 967, 94 L.Ed.2d 1 (1987)).

[237] As the Fifth Circuit stated in *Passmore*:

A Federal Rule is invalid if it exceeds either constitutional constraints or the constraints of the Rules Enabling Act, 28 U.S.C. § 2072. *See Burlington*, 480 U.S. at 5, 107 S. Ct. 967. A Rule is constitutionally valid if it is regulates matters that "are rationally capable of classification" as procedural. *Hanna v. Plumer*, 380 U.S. 460, 472, 85 S. Ct. 1136, 14 L. Ed. 2d 8 (1965). And, a Rule is valid under the Rules Enabling Act if it "really regulates procedure,—the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them." *Sibbach v. Wilson & Co*., 312 U.S. 1, 14, 61 S. Ct. 422, 85 L. Ed. 479 (1941).

133.     As to the first, "[a] state law directly collides with a Federal Rule if it provides a different answer to the question in dispute."[238]

134.     "To preclude the application of a state law . . . the relevant Federal Rule need not be identical in purpose or scope. Rather, the inquiry is whether the scope of the Federal Rule is sufficiently broad . . . to control the issue before the court, such that it answer[s] the same question' as the state law."[239]

135.     Here, the Court finds a direct collision between state and federal law.  As reflected above, state law would entitle Western to specific performance without any showing of a substantial threat of irreparable injury.

136.     Conversely, as amply demonstrated above, Rule 65 requires such a showing.

137.     Moreover, Rule 65 is sufficiently broad to control the issue before the Court and answer the same question as the state law claim: whether a plaintiff (here, a surety) is entitled to have defendants deposit with the Court the alleged losses plaintiff sustained before judgment to protect plaintiff from loss.

138.     Thus, under *Passmore*, the Court cannot enforce state law allowing specific performance absent proof of a substantial threat of irreparable harm, given Rule 65's requirements.

139.     Nevertheless, the Court notes that, even if there were no direct collision, Western would still be required to prove a substantial threat of irreparable harm; under this

---

*Id.* at 298–99.  Western cannot seriously contend that the issuance of a preliminary injunction is procedural.

[238] *Id.* (citing *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,* 559 U.S. 393, 398, 130 S. Ct. 1431 (2010) (majority opinion) (citing *Burlington,* 480 U.S. at 4–5, 107 S. Ct. 967)).

[239] *Id.* at 297 (internal citations and quotations omitted).

scenario, Rule 65's general requirement for a clear showing of a substantial threat of irreparable harm without the injunction would apply.

140.     For all these reasons, the Court finds that Western has failed to make a clear showing of a substantial threat of irreparable injury so as to entitle it to a preliminary injunction.  On this ground alone, Western's motion can be denied.

### 5. Western's Delay

141.     Nevertheless, even putting the above findings aside, Western has also failed to meet its burden of showing entitlement to this extraordinary relief for unreasonably delaying in seeking a preliminary injunction, without adequate justification and to PASI's prejudice.

142.     "The law is well-established that:"

> [D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction. Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief.[240]

143.     Wright and Miller similarly recognizes: "A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction."[241] On the other hand, in a different section on laches and preliminary injunctions, the treatise states:

> Unlike a defense based upon the statute of limitations, mere delay is not sufficient to bar injunctive relief on the ground of laches. . . . Delay coupled with knowledge and acquiescence in the acts complained of, as well as prejudice to defendant generally will be a sufficient basis for denying

---

[240] *Gonannies,* 464 F. Supp. 2d at 609 (quoting *Wireless Agents, L.L.C. v. T–Mobile USA, Inc.*, 2006 WL 1540587, *3 (N.D. Tex. June 6, 2006) (internal citations and punctuation omitted)).

[241] 11A Charles A. Wright, Arthur R. Miller, *et al.*, *Federal Practice and Procedure*, § 2948.1 (3d ed. 2018).

injective relief. . . . The defense of laches is equitable in nature and the court must look at all the factors or circumstances relevant to a given case when deciding whether relief should be barred. Thus, a lapse of time because of plaintiff's ignorance of his rights or his disability or in some situations, even neglect, when it is not attributable to a lack of diligence, should not bar the issuance of an injunction."[242]

144.     Thus, in *Gonannies*, the Northern District of Texas denied a motion for a preliminary injunction because the plaintiffs "first learned of the alleged infringing conduct on March 1, 2006, and filed this action on April 7, 2006, they nonetheless did not file the present motion seeking injunctive relief until September 15, 2006, and only after settlement negotiations had soured."[243] The Court concluded that "Plaintiffs' undue delay would be sufficient to rebut any possible presumption of irreparable harm" and cited several cases in support of its holding.[244]

145.     Conversely, in *Daily Instruments Corp. v. Heidt*,[245] a non-compete case, the Southern District of Texas found that, while the employer did not examine its former employee's laptop "until nearly four months after [the employee's] resignation" and was "therefore slow in coming out of the gate[,] [s]ince then, . . . [the employer] [had] shown diligence in prosecuting to enforce [the employment] agreements and to obtain relief

---

[242] 11A Charles A. Wright, Arthur R. Miller, *et al.*, *Federal Practice and Procedure*, § 2946 (3d ed. 2018).

[243] *Gonannies*, 464 F. Supp. 2d at 609.

[244] *Id.* (citing *Tough Traveler, Ltd. v. Outbound Prod.*, 60 F.3d 964, 968 (2d Cir. 1995) (vacating preliminary injunction where movant waited four (4) months to seek a preliminary injunction after filing suit); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (ten (10) week delay in seeking injunction for trademark infringement undercut claim of irreparable harm); *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975) (affirming district court's denial of temporary injunctive relief where movant, among other things, delayed three (3) months in making its request) (descriptions of authority quoted from *Gonannies*)).

[245] *Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553 (S.D. Tex. 2014).

from Defendants' complicity with him."[246] Conversely, Defendants had "resisted expedited discovery needed to prepare for the preliminary injunction hearing" and, "on the last business day before [the employer's] motion was to be heard, . . . removed the case" to federal court.[247] There, "Defendants persisted in opposing accelerated discovery, which finally required judicial intervention to permit the case to go forward."[248] The Court found that it was the employer that was "prejudiced by delay, not Defendants who continued to do business as they pleased and who resisted accelerated discovery that would expedite hearing on Plaintiff's motion."[249] The Court concluded that Plaintiff employer had "a decent although not an ideal explanation for its delay in seeking a preliminary injunction, but Defendants have suffered no prejudice as a result thereof, and Plaintiff has shown an ongoing immediate threat to continue irreparable injury to Plaintiff if a preliminary injunction is not issued."[250]

146.     Having carefully considered the law and facts, the Court finds that Western has unreasonably and without justification delayed seeking a preliminary injunction—both in its conduct before filing this suit and its conduct since suit was filed.

147.     First, Western has unreasonably delayed in its pre-suit actions.

148.     HPA terminated Western for default on February 25, 2015, and stated that it "intend[ed] to hold Western and PASI responsible for all costs associated with

---

[246] *Id.* at 570.

[247] *Id.*

[248] *Id.* at 571.

[249] *Id.*

[250] *Daily Instruments Corp.*, 998 F. Supp. 2d at 571.

completion of the work as well as any and all damages HPA might sustain because of PASI's failure to properly perform its work."[251]  On the same day, HPA informed Western of the termination and made demand on Western to perform its obligations under the Performance Bond.[252]

149.    Yet, it took until October 29, 2015, for Western to finally send a letter to HPA officially denying the performance bond claim for the first time.[253]

150.    While the Court recognizes Western's right to investigate, as PASI notes, this letter came eighty days from the issuance of the RTS Preliminary Report and two hundred, forty-six days after HPA's initial February 25, 2015, demand.  Given the findings and recommendations of the RTS Preliminary Report,[254] and the totality of the circumstances,[255] the Court finds that Western's delay in denying the performance bond claim was unreasonable.

---

[251] Jortner Aff. ¶ 7, Doc. 40-1; Letter from HPA to PASI, February 25, 2015, Ex. 9.

[252] Jortner Aff. ¶ 8, Doc. 40-1; Letter from HPA to Western, February 25, 2015, Ex. 10.

[253] Letter from Western to HPA, October 29, 2015, Ex. 32.

[254] RTS Preliminary Report 9–10, August 10, 2015, Ex. 22 ("We do not believe that the Surety can reach an agreement with HPA for completion and it appears that no other alternative exists but to allow HPA to contract directly with its subcontractors for the completion of the work. HPA must mitigate its loss and their completion of this subcontract work should be monitored if allowed to do so.").

[255] The Court emphasizes here Western's April 29, 2015, letter to HPA, wherein Western stated: "While we have been willing to cooperate and consider HPA's proposals [with ADS and M Natal], as surety we are entitled to accept or reject suggested contracts or otherwise put to bid with other contractors for competitive pricing." Letter from Western to HPA, April 29, 2015, Western Dep. Ex. 11, Ex. 60.  The Court believes this statement directly contradicts Western's position, taken through Jortner's testimony at the hearing, that Western had no control over HPA hiring a replacement bidder.  To the contrary, as the April 29, 2015, letter makes clear, Western was directly attempting to assert control over who HPA hired as a replacement contractor as early as April 29, 2015.

151.     Moreover, while Western has submitted evidence of conduct occurring between this October 29, 2015, denial, and its first lawsuit against the Indemnitors on September 5, 2017,[256] the Court finds that the record demonstrates unreasonable and unexplained gaps in major activity in the chronology.   Specifically, Western has failed to point to major activity during the following periods:[257]

    a.   PASI's November 18, 2015 Letter to Western[258] and the March 24, 2016, mediation between PASI, PASI's insurer, Western, and HPA[259]  (4 months);

    b.   The May 27, 2016 HPA Complaint[260] and Western's December 12, 2016 request for Joinder in the HPA/PASI arbitration[261] (6.5 months); and

    c.   The January 24, 2017, email from Jim Carver to AAA[262] and the July 18, 2017 settlement offer from Western to HPA[263] (7 months).

152.     Thus, Western not only waited about two years from the October 2015 demand before filing suit, there appears to be roughly eighteen months during that time period in which there was no major activity on these claims.  Further, Western has provided little explanation as to what Western was doing during these periods, other than a vague statement by Jortner at the hearing that Western was trying to settle the claims during one of these gaps.

---

[256] *Original Western-PASI Action*, *Complaint*, Doc. 1.

[257] *See Federal Rule of Evidence Article 1006 Summary to Prove Content*, Doc. 46-1.

[258] Letter from PASI to Western, November 18, 2015, Ex. 34.

[259] Email Chain involving multiple parties, December 30, 2015 to January 7, 2016, Ex. 35.

[260] HPA Complaint, Ex. 37.

[261] Email from Jim Green to S. Cleo Gladden, December 12, 2016, Ex. 38.

[262] Email from James Carver to S. Cleo Gladden, January 24, 2017, Ex. 42.

[263] Email from Jim Green to Kenneth Weckstein, July 18, 2017, Ex. 43.

153.     Further, these delay periods far exceed the four-month delay found acceptable by *Daily Instructions Corp.* and are even beyond the periods in *Gonannies* and its authority which found the delay too excessive to justify the injunction.

154.     Second, Western has delayed the proceedings in this Court.

155.     Western originally filed its first suit on September 5, 2017.[264]

156.     On October 4, 2017, Western sought leave to amend the notice of dismissal filed the preceding day so that it could refile "after additional research and investigation are complete."[265]

157.     While the need for further investigation can be a legitimate ground justifying delay, under the circumstances of this case, such a justification was unreasonable. Western made demand on the Indemnitors for the deposit of $2,500,000.00 in collateral on October 1, 2015.[266] The Court finds it unreasonable that Western would need further research and investigation over two years after filing the October 1, 2015, demand.

158.     Further, on November 9, 2017, Western filed the instant action against PASI.[267] Western waited nearly a month, until December 7, 2017, to file the instant motion for preliminary injunction.[268]

---

[264] *Original Western-PASI Action*, *Complaint*, Doc. 1.

[265] *Original Western-PASI Action*, *Amended Notice of Voluntary Dismissal Without Prejudice*, Doc. 19.

[266] Jortner Aff. ¶ 13, Doc. 40-1; Collateral Demand Letter from Western to Indemnitors, October 1, 2015, Ex. 25.

[267] *Complaint*, Doc. 1.

[268] *Western Surety Company's Motion for Preliminary Injunction*, Doc. 11.

159.	While Western moved for expedited consideration of its motion on December 7, 2017,[269] it failed to make an adequate showing before Judge Jackson, instead making the conclusory argument that it was entitled to expedited consideration on the same basis as its injunction.[270] Judge Jackson rejected the argument,[271] yet Western filed no motion to reconsider and provided no additional evidence or argument to correct the deficiencies found by Judge Jackson.

160.	Instead, Western re-urged the same arguments to the undersigned judge at the January 10, 2018, status conference, which undersigned also rejected. Again, no motion to reconsider was filed.

161.	Even stronger still, on April 4, 2018, Western Surety filed its *Unopposed Motion to Continue* the preliminary injunction hearing asking for the hearing to be moved and for the Court to push all prehearing deadlines back ninety days.[272]

162.	This case is thus analogous to *Gonannies*, where the mover sought the injunction "only after settlement negotiations had soured."[273] Similarly, the Court finds that Western, after having filed the motion (untimely), backed off at the prospect of settlement. This strongly indicates a lack of irreparable injury.

163.	Further, this case is unlike *Daily Instruments Corp.*, where (1) the obligors (a) obstructed by a late removal to federal court and (b) "persisted in opposing accelerated

---

[269] *Motion for Expedited Hearing/Submission*, Doc. 12.

[270] *Memorandum in Support of Motion for Expedited Hearing/Submission,* Doc. 12-1 at 1.

[271] *Ruling and Order*, December 12, 2017, Doc. 16.

[272] *Unopposed Motion to Continue*, Doc. 26 at 1.

[273] *Gonannies*, 464 F. Supp. 2d at 609.

discovery" to the point of "requir[ing] judicial intervention to permit the case to go forward"; and (2) the obligee demonstrated a threat of irreparable harm.[274] While the delay was justified in *Daily Instruments Corp.,* PASI has engaged in no such obstruction, and, again Western has failed to show a substantial threat of irreparable harm.

164.     Lastly, looking at the Wright and Miller factors articulated above, the Court finds that (1) PASI has been prejudiced by all of the above delays, (2) Western cannot claim to be ignorant of its rights, and (3) Western voluntarily acquiesced in PASI's conduct and showed a serious lack of diligence. The second and third are abundantly clear from the above analysis. As to the first, PASI has submitted evidence from HPA demonstrating that Western's delay substantially increased PASI's exposure for the Project.[275]

165.     For all these reasons, the Court finds that Western's delay in seeking the preliminary injunction, combined with Western's lack of reasonable explanation and PASI's prejudice, demonstrate that Western has not clearly shown a substantial threat that it will suffer irreparable harm.

## III.    ORDER

166.     Western has failed to satisfy its burden of making a clear showing that it faces a substantial threat of irreparable injury. Western has not demonstrated that it faces a serious threat of being unable to collect a judgment against PASI. Further, Western has unreasonably and without adequate justification delayed seeking a preliminary injunction, to PASI's detriment.

167.     Accordingly,

---

[274] *Daily Instruments Corp.*, 998 F. Supp. 2d at 570–71.

[275] HPA Complaint 2, ¶¶ 88–90, Ex. 37; HPA Dep. 7:23–8:22, Ex. 59.

**IT IS ORDERED** that *Western Surety Company's Motion for Preliminary Injunction*

(Doc. 11) is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>September 25, 2018</u>.


_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**